2016 IL App (1st) 121709
No. 1-12-1709
Opinion filed August 9, 2016

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JASON ORSA, BRIAN MURPHY, and LOUIS DANIELSON, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) ) | Nos. 11 CH 19551, 11CH 8166 & 11 CH 8424 (consolidated) |
| THE POLICE BOARD OF THE CITY OF CHICAGO and THE SUPERINTENDENT OF POLICE, | ) ) ) ) | The Honorable Kathleen M. Pantle, |
| Defendants-Appellants. | ) ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court, with opinion.[*]
Justices Neville and Simon concurred in the judgment and opinion.


**OPINION**

¶ 1     This case arises out of an assault by three off-duty Chicago police officers on a civilian.

The incident, which happened over 10 years ago, took place inside a fast food restaurant and was

captured on videotape. One of the officers pointed his service weapon at the head of the victim,

Obed DeLeon, and shoved him against a wall. The two other officers, along with a friend, then

_____
[*]This case was recently reassigned to Justice Hyman.

punched and kicked DeLeon until Chicago police officers arrived and took DeLeon into custody. Because the video has no audio, what provoked the assault is in dispute. The officers contend DeLeon shouted gang slogans and threatened to kill a cop; eyewitnesses contend DeLeon made no threats.

¶ 2    The superintendent of police charged the three officers with violating multiple Chicago police department (CPD) rules. After a hearing, the Chicago Police Board (Board) found two of the officers guilty and discharged them. The third was suspended for 18 months. On administrative review of the discharged officers' cases, the circuit court held that the Board violated the officers' due process rights and the charges were barred by *laches*, as the superintendent waited more than four years after the assault to bring the charges. Although not citing it as a basis for reversal, the court also stated that the Board's findings of fact were against the manifest weight of the evidence because the videotape supports the officers' claims that DeLeon threatened to kill a cop and "generally ma[de] statements designed to provoke and inflame the officers." The court ordered the superintendent to reinstate the officers who appealed. The superintendent filed a motion to reconsider, which the court denied. This appeal followed.

¶ 3    We reverse. The Board correctly found the charges were not barred by due process, *laches*, the Chicago Municipal Code, or the CPD's general orders. The Board's findings of fact should have been but were not treated as *prima facie* true and correct (735 ILCS 5/3-110 (West 2014)). Its determination that the attack on DeLeon was unprovoked was not against the manifest weight of the evidence; its decision to discharge was not arbitrary, unreasonable, or unrelated to the requirements of service.

¶ 4 Although we review the decision of the administrative agency and not the decision of the circuit court, we find inexplicable the circuit court's ruling on the manifest weight of the evidence. Not only does the circuit court disregard the Board's determination that the testimony of the two witnesses was particularly credible and the testimony of the police officers was not worthy of belief, but it also interprets what occurs on the surveillance video in ways that twist the facts and defy reason. Our careful and close review of the video leaves us dumbfounded by the circuit court's rejection of the Board's *prima facie* true and correct findings.

¶ 5 We cannot ignore an even more troubling aspect of this case—the inherently improbable character of the officers' defense, which largely relied on stirring prejudices by suggesting that DeLeon's conduct was gang-related. The Board categorically rejected the officers' version of the events, with its scrambled chronology, as inconsistent with and contrary to the surveillance video and the testimony of the two witnesses. Misconduct and manipulation of the sort that occurred here leaves a stain on the good honor of the vast majority of police officers in the department who comport themselves with integrity, dignity, decency, and discipline.

¶ 6                                    BACKGROUND

¶ 7 In the early morning hours of March 24, 2006, off-duty Chicago police officers assaulted a patron, Obed DeLeon, at a Taco and Burrito King (TBK) restaurant on the northwest side of Chicago. The restaurant's surveillance video shows plaintiff Officer Brian Murphy pointing his gun at DeLeon and pushing him against a wall. Fellow officers Jason Orsa and Daniel McNamara, and Murphy's friend, Mathew Walsh, pushed, punched, and kicked DeLeon until uniformed, on-duty police officers arrived. Murphy, Orsa, and McNamara then left the restaurant through the back door and did not file a tactical response report (TRR), as required by the CPD's General Order No. 02-08-05 or report the incident to a supervisor.

¶ 8    A few days later, DeLeon filed a complaint with the Office of Professional Standards (OPS), which began an investigation. The Independent Police Review Authority (IPRA), which replaced OPS in 2007, completed the investigation in October 2009, and, on July 2, 2010, the superintendent filed charges with the Board recommending discharge of Murphy and Orsa.

¶ 9    The superintendent charged Murphy and Orsa with violating Rules 2, 6, 8, 10, 14, and 22 of the CPD by bringing discredit on the department, disobeying an order or directive, disrespecting or maltreating a person while off duty, inattention to duty, making a false report, and failing to report improper conduct to the department. Murphy was additionally charged with violating Rules 9 and 38 for unjustified verbal or physical altercation with a person while on or off duty and unlawful or unnecessary use or display of a weapon. (The superintendent also charged McNamara and Sergeant Louis Danielson, one of the responding police officers, with rules violations. Neither is a party to this case and only those facts necessary for a complete understanding of plaintiffs' appeal are addressed.)

¶ 10    Before the Board hearing, Murphy and Orsa filed a motion to strike and dismiss, arguing the charges were not timely and were barred by due process, *laches*, the Chicago Municipal Code, and the CPD's general orders because they were not filed until four years and three months after the incident. The Board took the motion with the case. At the Board hearing, the superintendent called Shawn Nelson and Joseph Mularczyk as witnesses, and they testified to substantially the same events. On March 24, 2006, Nelson and Mularczyk were driving home from Nelson's girlfriend's house. At about 3:30 a.m., they stopped to eat at TBK and Nelson parked on the street because the entrance to TBK's lot was blocked by a late nineties Camaro parked perpendicular to the driveway so that no one could get in or out. They entered TBK through the back door; Mularczyk went into the bathroom, and Nelson got in line to order. As

Mularczyk left the bathroom, DeLeon, whom neither man knew, walked into the restaurant through the back door. Nelson and Mularczyk heard DeLeon make a general announcement asking TBK customers if anyone knew whose car had blocked the driveway. Nelson said that DeLeon appeared relaxed; his voice was loud, but he was not being obnoxious. Nelson and Mularczyk testified that DeLeon's finger was pointing forward and his thumb was pointing backward toward the back entrance. The video shows DeLeon motioning with his hand toward the back entrance.

¶ 11        No one responded to DeLeon's question. DeLeon then approached Nelson and Mularczyk, who were in line, and asked if they knew to whom the car belonged. Nelson testified he said no but told DeLeon that he was "kind of thinking the same thing [DeLeon] was." DeLeon then responded, "Yeah, that guy's an asshole for parking like that." Nelson said a man, later identified as Orsa, who was sitting with Murphy and McNamara, at a table closest to the counter said, " 'What if I'm that asshole?' " DeLeon responded, " 'Is that your car?' " and Orsa said, " 'What if it is my car?' "

¶ 12        As shown on the video, DeLeon then leaned toward the table and according to Nelson said, " 'You need to quit acting like an asshole and go move your car.' " Next, Murphy stood up, turned around, swept his gun in front of Nelson and Mularczyk, and pointed it at DeLeon's head. Nelson said he was close enough to see down the barrel of the gun. The other three men at the table, Orsa, McNamara, and Walsh, got up and surrounded DeLeon.

¶ 13        Nelson said he couldn't believe what was happening and thought "I could die here." He grabbed Mularczyk and pushed him into the kitchen, a few feet away. The kitchen's entrance was an open archway without a door. Nelson said he leaned out to see the four men, including Murphy and Orsa, throw DeLeon to the ground and kick and hit him. Nelson acknowledged his

view was partially blocked by people standing in front of him. Nelson testified that DeLeon tried to defend himself by covering up and tried to get up a couple of times but that the men held him down and continued to kick, hit, and knee him. Mularczyk testified that from the kitchen, he saw Orsa kick DeLeon twice in the torso.

¶ 14    When the men had DeLeon under control, Nelson and Mularczyk left the kitchen and walked out of the front door of the restaurant. They said they went one at a time to avoid looking as if they were involved in the fight. Nelson said that just before he and Mularczyk left the kitchen, he heard someone say that the men were police officers, although he did not know who said that. Nelson and Mularczyk never heard DeLeon say "cop killer," "Cobra love," or "Spanish Cobra," or anything to the effect of "I just ran into your car." Nor did they feel threatened by DeLeon.

¶ 15    Nelson and Mularczyk met outside in front of the restaurant and decided to stay to talk to the police. Nelson and Mularczyk tried to tell a responding female police officer and a male sergeant what happened, but the officers told them to wait and went into the restaurant. The officers then left the restaurant with DeLeon in handcuffs. Nelson said he tried to explain that DeLeon was "not the guy that did it. It was the four white guys." Nelson said "one of the sergeants asked us what our story was and we re-explained everything from the point where we walked in." The sergeant asked Nelson, " 'That's the story you're sticking to?' " Nelson said it was, and he and Mularczyk were placed under arrest. Nelson said he heard Lieutenant Danielson say, " 'Put this gangbanger in the paddy wagon,' " referring to DeLeon, and " 'arrest these two for being in the wrong place at the wrong time.' " Nelson, Mularczyk, and DeLeon were put in the back of a paddy wagon. Nelson said he noticed DeLeon had a bruise above his left eye and that his shirt and hat were missing. Nelson and Mularczyk were taken to jail and charged with

assaulting Matthew Walsh. They appeared in court but the case was dismissed because Walsh, the complaining witness, did not appear.

¶ 16    DeLeon testified that he went to TBK at about 4 a.m. on March 24, 2006, to get food for his pregnant fiancée. He wore a blue shirt, jeans, and a white hat. He had to park on a side street because two cars were blocking TBK's parking lot. DeLeon entered through the back door and asked in a loud voice, "Who's the asshole blocking the entrance to the parking lot?" He said he then got in line to order food and asked two men in front of him, Nelson and Mularczyk, if they knew "Who's the asshole blocking the entrance." A man sitting at a table to DeLeon's right said, " 'What if I'm the asshole blocking the entrance?' " DeLeon replied "Move your car then, asshole." DeLeon said Murphy, who was at the table with his back to him, jumped up, pulled out a gun from his waistband, put the gun to his face, and pushed him into the wall. DeLeon tried to smack the gun away and started to fight back. DeLeon saw Murphy reholster his gun. Three men who were sitting with Murphy also jumped up, grabbed DeLeon, and pinned him against the wall. DeLeon testified none of the men identified themselves as Chicago police officers or showed him a badge. DeLeon was swinging and trying to get away so he could get out of the restaurant, but the men pinned him with their knees and punched and kicked him.

¶ 17    DeLeon said the men held him down for a minute or so and allowed him to get up when uniformed police officers arrived. During the scuffle, DeLeon's shirt was ripped off and his tattoos became visible. DeLeon had two tattoos: a cobra on his left chest and "SC," which stands for Spanish Cobra, a street gang, on his back. DeLeon said that at the time of the incident, he was no longer affiliated with the Spanish Cobras, that he had "SC" removed when he was 23 or 24 years old, and that he was planning to remove the other tattoo. DeLeon said he did not own a gun or have one on him when he went into TBK. He denied saying "cobra love," "cop killer," "f***

the police," or "Spanish Cobra" or making any gang signals with his hands. He also denied saying he was going to "cap" someone or anything like that.

¶ 18    DeLeon said that when he got up from the floor, he did not see any of the men involved in the fight. He was arrested, placed in handcuffs, and escorted out of the restaurant. The police officers did not ask him any questions or allow him to explain what happened, but placed him in a paddy wagon with Nelson and Mularczyk. He said seeing them surprised him because they were not involved in the fight.

¶ 19    Len Villarreal, a TBK security guard, testified that he was at the front of the restaurant, about 50 feet away, when he saw the altercation between the plaintiffs and DeLeon. Villarreal did not hear DeLeon yelling or see him punch anyone in the mouth before the altercation. He said that no customers complained to him about DeLeon or said they felt threatened by him. He saw four men holding DeLeon down and punching and kicking him. Villarreal said he wanted to help DeLeon because "it was four against one." He went to try to break up the fight but when he got close, Murphy said he was a police officer and showed him his badge.

¶ 20    Orsa testified that on March 24, 2006, he and McNamara were off duty and went to a bar, where he had one beer. At about 4 a.m., they left the bar and went to TBK, where they ran into Murphy and Walsh. The four men placed their orders and waited at a table for their food. Orsa received his food and sat at a table facing the line. Murphy sat across from him. Orsa said DeLeon entered TBK through the back door and did not get in line to order food but instead was shouting threats against the police and identifying himself as a Spanish Cobra. Orsa denied saying "What if I'm the asshole" or anything else to DeLeon. Orsa said DeLeon approached the table where he was sitting with Murphy, McNamara, and Walsh, leaned in and threatened to kill police. At that point, Murphy jumped up, pulled his gun out and pointed it at DeLeon. Orsa,

8

McNamara, and Walsh jumped up as well. Orsa said he kicked DeLeon in the leg but that this was a defensive maneuver to stop DeLeon from flailing and kicking people nearby. He said he did not see Murphy punch or kick DeLeon but saw McNamara punch him once. He went to the other side of the table and put his hands out to separate patrons from the altercation and to prevent anyone from being injured. He said he told the security guard that he was a police officer in a voice loud enough so that everyone, including DeLeon, could hear it. He also told the cashier they were the police and asked him to call the police.

¶ 21        Orsa testified that when responding officers arrived, he identified himself to someone he thought was a police officer but acknowledged that the video shows him talking to someone in a blue shirt that is not a CPD uniform shirt. Orsa also testified that he doesn't remember having a face-to-face conversation with an on-duty police officer but remembers giving responding officer Bukowski his last name and telling him what happened. Orsa did not stay and give a statement because he thought his conversation with Bukowski sufficed. Orsa, McNamara, and Murphy all left the restaurant through the back door. Orsa admitted he was aware that a TRR was required when physical action is taken against an offender or aggressor but did not complete one because he did not think it was required for off-duty incidents. Murphy and McNamara also failed to complete a TRR and claimed they did not know one was required when they were off-duty.

¶ 22        Murphy testified that after work on March 23, 2006, he went to a bar across the street from TBK where he met Matt Walsh. Murphy said he did not drink any alcohol that night. After leaving the bar, he and Walsh walked to TBK. Murphy testified that when DeLeon walked into the restaurant, he started yelling that he was a cop killer and a Spanish Cobra, and was going to kill any cops in the restaurant. Murphy was wearing his police uniform cargo pants and boots and had his 9-millimeter gun holstered to his right hip. He did not want DeLeon to know he was

9

a police officer, so he immediately sat down at a table. Murphy said DeLeon leaned over his shoulder and continued to scream " 'Spanish Cobra,' " " 'Cop killer,' " and " 'Stand up if you're the police. I'll kill you right now.' " Murphy was scared because he did not know if DeLeon had a gun, so he pulled his gun on DeLeon and asked to see his hands. He did not, however, pat DeLeon down for weapons. Murphy reholstered his gun after seeing that Orsa was not armed. Murphy said he identified himself as a police officer and displayed his star.

¶ 23    Murphy said he spoke to Officer Bukowski at the scene. He could not recall whether he told Bukowski he was a police officer but was sure Bukowski figured that out because he was wearing his uniform pants. Murphy did not tell the responding officers that he drew his weapon or felt threatened by DeLeon. Bukowski told Murphy the situation was under control and to leave the restaurant. Murphy left out the back door.

¶ 24    Matthew Walsh testified he was in line waiting for food when DeLeon walked into TBK. Walsh said DeLeon "looked like [he] didn't belong in that neighborhood" because his hat was cocked to one side and he looked like a "gang-banger." Walsh said as soon as DeLeon walked in he yelled, " 'Cobra love,' " disturbing the whole restaurant. When Walsh got his food and sat down at the table with Murphy, Orsa, and McNamara, DeLeon was standing behind him yelling " 'Cop killer.' " Murphy said no one at the table said anything to DeLeon. Walsh said he turned around to look and "I don't really remember the whole course of the events, I just know I got hit at some point and I tried to assist to put him on the ground." The video does not show Walsh being hit by anybody. When officers arrived, Walsh stayed and signed complaints against DeLeon for battery and Nelson and Mularczyk for assault.

¶ 25    Officer Bukowski and Sergeant Delahanty (who has since retired) were among the first Chicago police officers to respond to a 911 call about a man with a gun at TBK. Bukowski

testified that on entering TBK he saw DeLeon face down and squirming around, trying to fight to get up, while two men were trying to hold him down. He said DeLeon seemed angry and was kicking and thrashing around. Bukowski handcuffed DeLeon to get him under control but said DeLeon was not under arrest. Bukowski could not say whether any of the men involved in the skirmish identified themselves as police officers because it was loud and he was focused on gaining control of DeLeon. Bukowski said DeLeon was yelling obscenities, including that he would " 'f*** Bukowski's mother to death,' " and that stuck with him because his mother had recently died of cancer.

¶ 26    Sergeant Danielson, who also responded to the 911 call, testified that he spoke to Walsh, who said he was attacked by DeLeon, Nelson, and Mularczyk. Danielson did not ask Walsh whether he saw a gun during the skirmish. Danielson also did not speak to any other patrons or the restaurant manager to find out what happened. Danielson said that Sergeant Delahanty was already there when he arrived and was in charge of the investigation. Danielson heard Mularczyk proclaim his innocence and described him as being "uncooperative" and "belligerent." Danielson said based on information from other officers, he ordered that DeLeon, Nelson, and Mularczyk be taken to the 16th district and that DeLeon be charged with battery and Nelson and Mularczyk with simple assault.

¶ 27                              Board's Findings and Decision

¶ 28    On January 20, 2011, the Board issued its findings and decision. First, the Board denied the officers' joint motion to strike and dismiss the charges, finding their due process rights were not violated because they remained employed before they were charged and thus, were not deprived of any property. The Board also found no *laches* claim because the officers could not

show they were prejudiced by the delay in filing charges and that the CPD's general orders did not require dismissal.

¶ 29    The Board found Murphy and Orsa guilty of all charges. The Board stated that the surveillance video showed Murphy pulled his weapon on DeLeon, rammed him into a wall, and that Murphy, Orsa, McNamara, and Walsh pummeled DeLeon. The Board noted that the officers' principal defense was that DeLeon verbally threatened them with taunts about his gang affiliation and that he was a "cop killer" ready to "cap someone." But, the Board rejected the contention that DeLeon threatened defendants or anyone else in the restaurant. The Board found Nelson and Mularczyk to be credible and disinterested witnesses, who were close in proximity to the altercation and had the opportunity to observe what transpired and hear what DeLeon and the officers said with little incentive to lie or exaggerate. The Board believed their testimony that DeLeon did not threaten anyone in the restaurant or act or speak in a threatening manner and that Orsa escalated the situation by asking DeLeon, "What if I'm that asshole?"

¶ 30    As to the officers' testimony, the Board found it to be false and unbelievable. First, the Board concluded that the officers' decision to sit near DeLeon was inconsistent with their assertion that they felt threatened by him. The Board further found that the videotape did not support their claim that DeLeon threatened them, because, although it shows DeLeon was upset, his body movements and the response of others in the restaurant was inconsistent with the type of threats that Murphy, Orsa, and McNamara claimed he made. Nor did any evidence indicate DeLeon was armed or accompanied by anyone else, such as a fellow gang member or made a gang sign. "Most importantly," the Board stated, "the decision of Officers Murphy, McNamara, and Orsa to leave the premises and not provide information to the responding Chicago police

officers about Mr. DeLeon's supposed threats (including threats to kill officers) seriously undermines the credibility of their testimony."

¶ 31     The Board determined that Walsh gave "completely incredible" testimony because the video disputes his claim that DeLeon started the altercation by punching him. Further, Walsh signed a complaint against Nelson and Mularczyk alleging assault, when the video shows he had no contact with them whatsoever.

¶ 32     The Board did not rely on DeLeon's testimony in reaching its decision.

¶ 33                              The Circuit Court Decision

¶ 34     In March 2011, Orsa and Murphy filed separate complaints for administrative review in the circuit court. The court consolidated the cases and reversed the decision of the Board finding that the officers' joint motion to dismiss should have been granted because their due process rights were violated and the charges were barred by *laches*. In addressing the prejudice component of the *laches* claim, the court found the evidence was not closely balanced and that "[t]he videotape and other evidence support Murphy's and Orsa's and their witnesses' recollection of events." Specifically, the court found, based on the video, that "DeLeon entered the Taco Burrito King with no intention of getting something to eat." That he "was aggressive," "flashed gang signs," and "kept his right hand in his pocket *** suggesting that he was armed." The court said the video corroborated the officers' testimony that DeLeon threatened to "cap" someone, was yelling "Cobra Love," "cop killer," and "f*** the police," and generally trying to provoke the officers.

¶ 35     The court found DeLeon not credible, based on his four felony convictions and his "evasive" and "impeached" testimony. The court acknowledged that the Board did not rely on DeLeon's testimony, but found that it should have considered it to the extent it corroborated the

13

officers' case. The court further found Nelson and Mularczyk were not disinterested witnesses; both believed they had been unfairly arrested, and the videotape and the testimony of the officers and other witnesses contradicted their testimony. The court ordered the Board to reinstate Murphy and Orsa. The superintendent filed a motion to reconsider, which the trial court denied after a hearing.

¶ 36                                           ANALYSIS

¶ 37                                  Timeliness of the Charges

¶ 38        Plaintiffs' contend the superintendent and IPRA filed untimely charges in violation of their rights to due process, the Chicago Municipal Code, and CPD General Order No. 93-03. The due process clause protects fundamental fairness and justice. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264 (2004). Procedural due process claims question the constitutionality of the procedures used to deny a person of life, liberty, or property. *Id*. While the core of due process is the right to notice and a meaningful opportunity to be heard, it is a flexible concept and requires those procedural protections demanded by fundamental principles of justice and the particular situation. *Callahan v. Sledge*, 2012 IL App (4th) 110819, ¶ 27. Under well-established constitutional jurisprudence, every citizen has the right to pursue a trade, occupation, business, or profession. *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 300 (2007). We review *de novo* a claim of a constitutional right violation.

¶ 39        As to plaintiffs' rights to due process, we are satisfied that no due process rights were infringed. They rely on *Morgan* and *Lyon*, but both *Morgan* and *Lyon* involved a delay in the adjudication of allegations of misconduct after the plaintiffs had been suspended from employment, not a delay in the investigation. In *Morgan*, the appellate court held that the State

violated a clinical psychologist's right to due process when the State took 15 months to decide the case after issuing a suspension. *Morgan*, 374 Ill. App. 3d at 303. In *Lyon*, the supreme court held that the Director of Children and Family Services failed to abide by specific regulatory time limits for decision making after suspending a teacher for allegedly abusing students. *Lyon*, 209 Ill. 2d at 282. While we agree that plaintiffs have a property interest in their employment, they remained employed with the CPD throughout the investigation until charges were officially filed. Furthermore, they were immediately given notice of the charges and a thorough and meaningful opportunity to be heard during a five-day hearing before the Board. Accordingly, plaintiffs' rights to due process were not violated.

¶ 40 Plaintiffs also contend that sections 2-57-70 and 2-57-160 of the Chicago Municipal Code required IPRA to notify them of delays in the investigation and to resolve the complaint in a timely manner. Chicago Municipal Code § 2-57-70 (added Nov. 8, 2012); § 2-57-160 (added July 19, 2007). Section 2-57-160 provides, in part, "complaints concerning police misconduct and abuse are [to be] resolved fairly and timely." Chicago Municipal Code § 2-57-160 (added July 19, 2007). It does not, however, set a deadline for bringing charges. Section 2-57-70 of the Code provides that when an investigation remains open after six months, the chief administrator must notify the mayor's office, the city council committee on public safety, the complainant, and the officer or his or her counsel of the investigation's general nature and reasons it has yet to be completed. Chicago Municipal Code, § 2-57-70 (added July 19, 2007).

¶ 41 Both provisions are part of an ordinance that created the IPRA to replace OPS. That the ordinance was adopted more than a year after OPS commenced the investigation of this incident means the six month notification provision was not in effect at the time. Furthermore, nothing in the ordinance suggests that failure to comply with section 2-57-70 results in automatic dismissal

and plaintiffs cite no authority to support the presumption that automatic dismissal is the proper sanction. In addition, the statute of limitations for a claim of unreasonable use of force by a police officer is five years. See 65 ILCS 5/10-1-18.1 (West 2014). And, as this court recently held, that statute of limitations does not apply to other charges against a police officer that do not require evidence of an unreasonable use of force as an element of the charge. *Castro v. Police Board*, 2016 IL App (1st) 142050. Thus, given that the charges against Murphy and Orsa were brought well within the five year statute of limitations for unreasonable use of force and that the other charges have no statute of limitations, we cannot find that dismissal is warranted simply because the superintendent waited just over four years to bring the charges.

¶ 42    Similarly, we do not find a violation of General Order No. 93-03, which requires a prompt and through investigation. Although the investigation took a substantial amount of time, this directive does not set an absolute deadline within which investigations must be completed, but provides that if the investigation lasts more than 30 days, the investigator must seek and obtain an extension of time within which to complete the investigation. See Chicago Police Department General Order No. 93-03 (eff. Apr 15, 2011). The IPRA regularly sought and received extensions of time to complete its investigation. Once completed, CPD directives required the matter be further reviewed at several levels. And even if a violation occurred, nothing in the directive suggests and plaintiffs provide no support, for automatic dismissal. Moreover, we note that section 10-1-18.1 imposes a five-year statute of limitations on any charges of unreasonable use of force. 65 ILCS 5/10-1-18.2 (West 2014).

¶ 43    Plaintiffs also contend the doctrine of *laches* applies. Specifically, they say they could have found other patrons of TBK to rebut Nelson and Mularczyk on the issue of whether DeLeon entered the restaurant making threats against police officers. And they contend the responding

officers and accused officers would have a better recollection of events if their statements were taken immediately after the incident.

¶ 44       *Laches* is an equitable doctrine that precludes the assertion of a claim by a litigant whose unreasonable delay in raising that claim has prejudiced the opposing party. *City of Chicago v. Alessia*, 348 Ill. App. 3d 218, 228 (2004). The doctrine's premise is the equitable notion that courts are reluctant to aid a party who has knowingly slept on his or her rights to the detriment of the opposing party. *Id*. Two elements must exist for *laches* to apply: (1) lack of diligence by the party asserting the claim and (2) prejudice to the opposing party resulting from the delay. *In re Sharena H.*, 366 Ill. App. 3d 405, 413 (2006). A mere time lapse from the accrual of a cause of action to the filing of a lawsuit does not support a *laches* defense. *Madigan ex rel. Department of Healthcare & Family Services v. Yballe*, 397 Ill. App. 3d 481, 493 (2009). Moreover, as a general rule, the doctrine of *laches* is inapplicable to governmental entities absent extraordinary circumstances because *laches* could impair the functioning of the government, which, in turn, would adversely affect the public. *Id.* at 493-94. Generally, the decision to invoke *laches* involves a discretionary power. *Van Milligan v. Board of Fire & Police Commissioners*, 158 Ill. 2d 85, 91 (1994). We will not disturb the Board's determination "unless that determination is so clearly wrong as to constitute an abuse of discretion." (Internal quotation marks omitted.) *Lozman v. Putnam*, 379 Ill. App. 3d 807, 822 (2008).

¶ 45       Plaintiffs fail to establish prejudice resulting from the delay in filing charges. We have already discussed that plaintiffs were not prejudiced by losing their employment since they were gainfully employed until charges were filed and were only terminated after a full and fair hearing. Plaintiffs' assertion that they were prejudiced by their inability to find counter-evidence does not alone constitute an extraordinary circumstance. First, plaintiffs' contention that they

could have found other restaurant patrons who would have contradicted the superintendent's witnesses who testified that DeLeon was not yelling, was not threatening the officers, or scaring other patrons was purely speculative. Although plaintiffs contend Nelson and Mularczyk were biased because they were improperly arrested following the altercation and charged with assault, the security guard at the restaurant, who had no apparent bias, did not support defendants' contention that DeLeon walked into the restaurant shouting gang slogans or threats to kill cops. Further, the record fails to establish, as plaintiffs assert, that material witnesses had trouble with their overall recollection of events. Thus, we cannot say the Board abused its discretion in finding that no extraordinary circumstances existed to warrant invoking the doctrine of *laches*.

¶ 46                                    Manifest Weight of the Evidence

¶ 47        The superintendent contends the Board's decision to terminate plaintiffs was not against the manifest weight of the evidence and should be affirmed. In an appeal from the judgment of an administrative review proceeding, we review the decision of the administrative agency and not the decision of the circuit court. *Krocka v. Police Board*, 327 Ill. App. 3d 36, 46 (2001). The scope of review of an administrative agency's decision regarding discharge requires a two-step analysis. *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 550 (1981). We must determine if the administrative agency's findings of fact are contrary to the manifest weight of the evidence. *Id*. In doing so, we treat the findings and conclusions of the administrative agency as *prima facie* correct. *Kappel v. Police Board*, 220 Ill. App. 3d 580, 588 (1991). We do not reweigh the evidence or substitute our judgment for that of the agency. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006). "Conflicts in witness testimony do not constitute a sufficient reason to reverse an administrative agency's decision, since the agency's responsibility is to resolve the conflicting evidence."

*Collura v. Board of Police Commissioners*, 135 Ill. App. 3d 827, 839 (1985). "When sufficient evidence in the record supports an administrative agency's findings, the decision will not be reversed." *Id.*

¶ 48    Then, we must determine if the findings of fact provide a sufficient basis for the police Board's conclusion that cause for discharge existed. *Crowley v. Board of Education*, 2014 IL App (1st) 130727, ¶ 29. Because the Board is in the best position to determine the effect of an officer's conduct on the operations of the department, we give considerable deference to its determination of cause. *Robbins v. Department of State Police Merit Board*, 2014 IL App (4th) 130041, ¶ 39. Thus, we may not consider whether we would have imposed a more lenient sentence. *Krocka*, 327 Ill. App. 3d at 48. Accordingly, the Board's decision will not be overturned unless shown to be arbitrary and unreasonable, or unrelated to the requirements of the service. *Siwek v. Police Board*, 374 Ill. App. 3d 735 (2007).

¶ 49    Based on our thorough review of the record, and the surveillance video in particular, we hold that the Board's findings, which were based on the Board's assessment of the witnesses' testimony and the videotape, were *prima facie* true and correct and, therefore, were not against the manifest weight of the evidence. The Board believed the testimony of Nelson, Mularczyk, and the security guard and disbelieved the officers' testimony. The surveillance video of the incident shows DeLeon lean toward the table where Murphy, Orsa, McNamara, and Walsh were sitting. Murphy, who had his back to DeLeon, then reached for his gun, which was holstered on his right hip, pulled it out, stood up, and swept the gun in front of Nelson and Mularczyk. According to Nelson, he could see down the gun's barrel. Then Murphy pointed the gun at DeLeon's head, while simultaneously shoving him into the wall. The video also shows the other three men at the table jumping up and punching and kicking DeLeon, who is attempting to fend

them off. The four men continue to pummel DeLeon until he is subdued and on-duty officers arrive.

¶ 50     The only dispute was whether plaintiffs' actions were justified by DeLeon's supposed threats, as plaintiffs contended, or unjustified because DeLeon did not act in a threatening manner, as Nelson and Mularczyk testified. In light of the fact the surveillance video had no audio, this was a credibility determination for the trier of fact, the Board, which found that Nelson, Mularczyk, and the security guard were credible and that plaintiffs and Walsh were not. The Board noted that Nelson and Mularczyk were "independent witnesses" and offered "very compelling testimony." The Board noted that Nelson and Mularczyk, who were close in proximity to DeLeon and the plaintiffs, testified that DeLeon did not act or speak in a threatening manner and that Orsa escalated the situation by saying to DeLeon, " 'What if I'm that asshole?' " The Board described their demeanor as "credible" despite rigorous cross-examination.

¶ 51     The videotape fully supports the Board's credibility determination. Because the video lacks audio any attempt to suggest that the people in the video made certain statements or flashed gang signs would be pure speculation and conjecture. Murphy, Orsa, and Walsh testified that DeLeon walked into the restaurant shouting " 'Cobra Love,' " " 'cop killer,' " and " 'I'm going to cap someone.' " In short, they allege that he was directly threatening them because he knew them to be police officers and that Murphy responded in a reasonable manner to those threats. The plaintiffs' reactions and the reactions of other patrons do not support this version of events. The video supports the testimony of Nelson and Mularczyk that DeLeon was upset when he walked into the restaurant. He appears to say something in a loud voice, as several patrons, including Murphy, McNamara, and Walsh, who were at the counter, turned in his direction. After looking toward DeLeon, however, most patrons, including Walsh and McNamara, turned

back around and continued to wait for their orders. McNamara, who stood next to Walsh at the counter turns around and says something to Murphy before walking directly toward DeLeon, passing in front of him, and taking a seat next to Murphy. After Walsh gets his food, he too walks directly toward DeLeon, passes in front of him, and sits down at the table. The officers' reactions and the reactions of other patrons are inconsistent with their contention that DeLeon threatened them or they feared he might have a gun and harm them. Moreover, the off-duty officers' decision to sit at a table directly in front of DeLeon does not support their contention that he was shouting threats of killing cops.

¶ 52     The video then shows a man in line in front of Nelson and Mularczyk, lean toward DeLeon, say something to him, shake his head, and then turn around and place his order. DeLeon then says something to Nelson and Mularczyk. The exchange is short and neither they nor a man in the white shirt appears to be nervous or concerned about what DeLeon is saying. Indeed, the video supports Nelson's and Mularczyk's contention that DeLeon was asking whose car was blocking the parking lot. He likely had the same exchange with the man in the white shirt. One would not expect these types of calm reactions to someone who was threatening to "cap" someone.

¶ 53     The video also does not support plaintiffs' contention that DeLeon was making gang signs, namely the letter C, which is the sign for the Spanish Cobras gang. In the video, DeLeon keeps his hand in his right pocket and makes a gesture with his left hand. He appears to point toward the parking lot, in the direction of the car that is blocking the entrance. Plaintiffs' and Walsh's narrative appears contrived because it is incongruous with what one sees happening on the videotape; nothing in the videotape reveals DeLeon making a "C" or any other type of gang sign.

¶ 54        After plaintiffs subdued DeLeon, they handed him off to on-duty police officers. They then walked out the back door of the restaurant without informing the responding officers that DeLeon had threatened to kill a cop and that they were so afraid that Murphy pulled a gun on him. We agree with the Board that this further undermines their credibility.

¶ 55        Matt Walsh's testimony when viewed in conjunction with the videotape also undermines plaintiffs' version of events. Walsh testified on plaintiffs' behalf that DeLeon started the altercation by punching him. Further, Walsh signed a complaint for assault against Mularczyk and Nelson. The video shows that Deleon did not punch Walsh and that Walsh had no contact with Mularczyk or Nelson, who immediately go into the kitchen as the altercation begins. After DeLeon has been subdued, Nelson and Mularczyk walk out of the restaurant, one after the other, without having any contact or interaction with Walsh. Walsh also provided information for a case report and does not mention that DeLeon made a threat. Thus, we agree with the Board that Walsh gave "completely incredible" testimony.

¶ 56        The Board heard directly conflicting testimony from the plaintiffs and Nelson and Mularczyk. Its resolution of that conflict and its finding that Murphy and Orsa were not provoked by threats from DeLeon was supported by sufficient evidence, particularly the videotape, and we cannot say "the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). Thus, the Board's finding was not against the manifest weight of the evidence, and we will not reverse.

¶ 57        The Board's other findings also were not against the manifest weight of the evidence. It is undisputed that Murphy and Orsa did not file a TRR or report the altercation to a supervisor. They claimed they did not think a TRR was needed because the incident occurred while they were off duty but conceded that the CPD's General Order No. 02-08-05 requires a TRR whether

22

the officer is on duty or off duty. Murphy also concedes he left the restaurant without informing the responding officers that he pulled his gun on DeLeon or that DeLeon allegedly made threats that he was a cop killer. The Board stated that Murphy and Orsa claimed they talked to responding officer Bukowski, who told them to go outside, but the Board found the testimony of Bukowski that no one identified themselves as off-duty officers, to be more credible. We have no basis to reverse or disbelieve this credibility determination. Moreover, the Board found that simply identifying themselves to Bukowski was not sufficient. Murphy and Orsa should have stayed and explained in detail what occurred and why they pulled a gun on DeLeon, pinned DeLeon to the ground, and held him for the on-duty officers.

¶ 58       The Board also found that Murphy and Orsa made false statements to IPRA when they claimed DeLeon threatened them. The Board found Nelson and Mularczyk more credible than plaintiffs on the question of whether DeLeon made threats, and we will not disturb that credibility determination. The Board held that Orsa made a false statement when he told IPRA he did not know who DeLeon began fighting with when the video shows Murphy initiated the encounter. The Board further held that Murphy did not make a false statement to IPRA when, in 2007, he said he could not remember the other officers with him on March 24, 2006, or that DeLeon was reaching into his waistband, because the video shows DeLeon with his hand in his pocket before the altercation. None of these findings are against the manifest weight of the evidence.

¶ 59                                    Cause to Discharge

¶ 60       We next consider whether the findings of fact provide a sufficient basis for the Board's conclusion that cause for discharge exists. A police officer may not be discharged without cause. 65 ILCS 5/10-1-18(a) (West 2012). "Cause" has been defined as " 'some substantial shortcoming

23

which renders [the employee's] continuance in his office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his [discharge].' " *Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101, 105 (1983) (quoting *Fantozzi v. Board of Fire & Police Commissioners*, 27 Ill. 2d 357, 360 (1963)). Because the Board, and not the reviewing court, stands in the best position to determine the effect of an officer's conduct on the department, the reviewing court gives the Board's determination of cause heavy deference. *Valio v. Board of Fire & Police Commissioners*, 311 Ill. App. 3d 321, 330-31 (2000). Illinois courts have recognized that "police departments, as paramilitary organizations, require disciplined officers to function effectively and have accordingly held the promotion of discipline through sanctions for disobedience of rules, regulations and orders is neither inappropriate nor unrelated to the needs of a police force." *Siwek*, 374 Ill. App. 3d at 738. We may not consider whether we would have imposed a more lenient disciplinary penalty. *Krocka v. Police Board*, 327 Ill. App. 3d 36, 48 (2001).

¶ 61    The Board determined Murphy's and Orsa's conduct to be sufficiently serious to warrant discharge. For Murphy, this conduct included pointing a gun at a civilian without justification and pushing DeLeon against a wall, not remaining at the scene of the incident, and making false official reports in an attempt to cover-up his and others' misconduct.

¶ 62    For Orsa, this conduct included kicking a civilian repeatedly without justification, actively participating in rather than attempting to control a dangerous and disorderly situation, not remaining at the scene of the incident, and making false official reports in an attempt to cover-up his and others' misconduct.

¶ 63       Based on our review of the record and the Board's rationale for its decision to discharge plaintiffs, we cannot say the Board's decision was unreasonable, arbitrary, or unrelated to the requirements of service. The appellate court has upheld the discharge of an officer based on unreasonable force. For instance, in *Bultas v. Board of Fire & Police Commissioners*, 171 Ill. App. 3d 189, 196-97 (1988), the court upheld the discharge of an officer for one incident of kicking a person in custody. The court stated that "As our supreme court has noted, the discharge of a police officer for conduct unbecoming to the department is not only for the purposes of punishing that individual, but is also for the protection of the community at large." *Id*. at 196. See also *Zions v. Police Board*, 67 Ill. App. 3d 680, 687 (1978) ("A brutal and unwarranted physical attack upon a member of the public by a police officer is a valid reason for his separation from the force."). As evidenced by the videotape, after pointing his weapon at DeLeon, Murphy shoved him against the wall. Orsa shoves DeLeon and kicks him several times while he is on the ground. This conduct is certainly "unbecoming to the department" and is a "substantial shortcoming" that renders their continued employment detrimental to the discipline and efficiency of the service.

¶ 64       The appellate court has upheld the Board's decision to discharge an officer for misuse of a weapon. Safety precautions in handling, safekeeping, cleaning, transporting, and firing his or her weapon involves a basic responsibility of every police officer. Although the officer may be off duty at the time of the improper use of his or her weapon, case law does not draw on this distinction in regard to the seriousness of the misconduct. See *Davenport v. Board of Fire & Police Commissioners*, 2 Ill. App. 3d 864 (1972). While off duty, Murphy misused his weapon when, unprovoked, he brandished it in a crowded restaurant, coming within inches of several

patrons, and pointed it at DeLeon. This action, alone, was sufficiently serious to justify his discharge.

¶ 65     We affirm the decision of the Board finding Murphy and Orsa guilty of all charges and reverse the decision of the circuit court.

¶ 66     Reversed.