2024 IL App (1st) 231909-U

Fourth Division
Filed October 10, 2024

No. 1-23-1909

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | |
|---|---|
| REBECCA THUESTAD, | ) |
|     Plaintiff-Appellee, | ) |
| | ) |
|   v. | ) Appeal from the |
| | ) Circuit Court of Cook County |
| THE POLICE BOARD OF THE CITY OF | ) |
| CHICAGO and THE SUPERINTENDENT | ) No. 2022 CH 06228 |
| OF POLICE FOR THE CITY OF CHICAGO, | ) |
|     Defendants | ) The Honorable Anna H. Demacopoulos, |
| | ) Judge, presiding. |
| (The Superintendent of Police for the City of | ) |
| Chicago, Defendant-Appellant). | ) |

JUSTICE OCASIO delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1   *Held:*  We reverse the circuit court's order that reversed the Police Board of the City of Chicago's findings and administrative decision to terminate plaintiff's employment. The Police Board of the City of Chicago's finding is affirmed as its factual findings were not against the manifest weight of the evidence and the decision to terminate plaintiff's employment was not arbitrary, unreasonable, or unrelated to the requirements of service.

¶ 2    Appellant, the Superintendent of the Chicago Police Department (Superintendent), appeals from the circuit court's October 6, 2023 order reversing the findings and decision of the Police Board of the City of Chicago (Board) to discharge Appellee, Rachel Thuestad, from the Chicago

Police Department and from the circuit court's October 18, 2023 order granting Thuestad's motion to be compensated for lost wages and benefits with interest. For the following reasons, we reverse the circuit court's orders and we affirm the decision of the Board.

¶ 3                                    BACKGROUND

¶ 4     On December 8, 2015, at approximately 4:30 p.m., Thuestad and her partner, Officer Juan Belmontes, stopped a vehicle for not having a City of Chicago sticker and failing to signal. During the traffic stop, they learned that the driver, Quinton Pipkins, was driving on a suspended license. Pipkins was handcuffed, placed in the police vehicle, and taken to the 10th District police station. On the way to the station, Pipkins told the officers he could turn in a gun.

¶ 5     Upon arriving at the police station, Pipkins was taken to the processing room. After making multiple phone calls, Pipkins told Thuestad and Officer Belmontes the location of the gun. Thuestad and Officer Belmontes left to retrieve the gun, while Pipkins remained in the processing room. The officers retrieved the gun, returned to the police station, and released Pipkins.

¶ 6     Thuestad wrote the case report for the incident. The report did not mention the traffic stop, and it listed Pipkins as the "person reporting offense" (changed from all-caps). There was no arrest report for Pipkins, and he was not issued a citation for driving on a suspended license. The case report stated:

> "In summary R/Os while on a traffic stop spoke with [Pipkins]. During this conversation, [Pipkins] related to R/Os he observed an unknown male black place, what [he] believed to be, a handgun near the Pink Line tracks at the above location. R/Os relocated to the area for further investigation and located one unloaded KelTec, P40, 40 cal, semi automatic hand gun, bearing serial number #95334, with black finish and three inch barrel. R/Os recovered said weapon and made it safe. Gun desk notified @ 1934 hrs Harro #18947. Weapon inventoried under #13588238." (Changed from all-caps.)

Additionally, Pipkins's name was not recorded in the prisoner's log, and no supervisor was informed that he was released without charges. A few days later, Pipkins's uncle, Larry Rogers went to the station about the gun, which he owned.

¶ 7    The Bureau of Internal Affairs (BIA) investigated the incident. Thuestad was interviewed twice by BIA investigators. During interviews with BIA investigators, Thuestad stated that, during the transport to the station, Pipkins was crying and telling officers about his children and the Christmas presents he had in his car. During transport and while Pipkins was in the processing room, Pipkins stated he had seen an individual place a gun in the alley behind his grandmother's house. Thuestad stated that she was only present for one phone call in the processing room, in which Pipkins was making arrangements for a ride home from the police station. Thuestad stated she spent "[m]aybe a minute or two" with Pipkins in the processing room before she and Officer Belmontes left to retrieve the gun. She could not remember if she informed her supervisor before leaving. Thuestad acknowledged speaking to an "unknown male black" one time in the alley, but she denied knowing he was Rogers or discussing the gun with him. Thuestad also stated she did not include her conversation with the "unknown male black" in her case report.

¶ 8    Thuestad did acknowledge that she violated Chicago Police Department (CPD) rules by failing to issue Pipkins a citation for driving on a suspended license and failing to document the incident in an arrest report. Thuestad denied that her narrative in the case report was false. She used the term "traffic stop" to describe the entire interaction with Pipkins, from the time the vehicle was curbed until his release from the police station.

¶ 9    On January 4, 2021, the Superintendent brought charges before the Police Board against Thuestad seeking her termination from the CPD for violations of several rules of conduct. The Superintendent also alleged Thuestad also made false statements to internal affairs investigators.

¶ 10    The Board held a four-day hearing. At the hearing, Thuestad testified she had been a CPD officer since March 9, 2009. On the night of December 8, 2015, she was on duty working on the tactical team in the 10th District and she was working with Officer Belmontes. Thuestad and Officer Belmontes were driving through the district when they conducted a traffic stop. Thuestad

testified they stopped the car because it did not have a city sticker and it failed to signal a left turn. Inside the vehicle, there were three individuals, including Pipkins, who was the driver. During the traffic stop, Thuestad and Officer Belmontes learned that Pipkins had a suspended driver's license, and he was detained. The other occupants of the vehicle were allowed to leave. Pipkins was handcuffed, placed in the police car, and taken to the 10th District station.

¶ 11     Thuestad testified that, during transport, she advised Pipkins that they were taking him to the station to run his name for any warrants or investigative alerts. Pipkins was also advised of the reason for the traffic stop. Thuestad testified that, during transport, Pipkins said that "he knew where a gun was laid up." At the station, Pipkins, still in handcuffs, was placed in the processing room. Thuestad stated she went in and out of the processing room "[a] couple of times." After Officer Belmontes provided her information about a gun, Thuestad went into the room to verify the information with Pipkins. Thuestad stated that, during the conversation, she asked Pipkins if he saw who placed the gun in the alley, and he said that it was someone who looked like him. Thuestad testified that she was present in the processing room when Pipkins made a phone call about getting a ride home from the police station, "not about arranging for a firearm."

¶ 12     After Pipkins provided Thuestad and Officer Belmontes the location of the gun, they proceeded to the location. Pipkins remained in the processing room, and Thuestad told another officer to keep an eye on Pipkins. Thuestad testified that, when she and Officer Belmontes were looking for the gun, she was approached by a man.

¶ 13     Once the gun was recovered, Thuestad and Officer Belmontes returned to the police station. Thuestad testified that she returned to the processing room and asked Pipkins if his ride had arrived. Once he confirmed his ride was there, Thuestad and Officer Belmontes drove Pipkins to his parked vehicle. Thuestad testified that Pipkins was detained for "about an hour and 30 minutes."

¶ 14     Thuestad testified she did not make any false statements. Thuestad also maintained she never lied or tried to conceal the circumstances surrounding the recovery of the gun. Thuestad testified that she defined the "traffic stop" as taking place from the time Pipkins was initially

detained until he was released from the police station. She stated that the "[d]uration of the stop is until that person is out of your presence." She also denied knowing that Pipkins made calls to arrange for the gun. Thuestad testified that she "wasn't aware of all the phone calls [Pipkins] was making" and she was only "present for the one where he called for the ride home."

¶ 15    Thuestad further testified that she did not violate any CPD directives because she had the discretion to not issue Pipkins a citation and not complete an arrest report. Thuestad stated that she made the decision not to arrest Pipkins during transit to the 10th District after hearing him talk about "his story and his life and his children and Christmas." Thuestad testified that she did not notify the watch commander that Pipkins was in the processing room because Pipkins "was being detained for preliminary investigation on a traffic stop. He was not in custody. He was not a prisoner." Further, she did not submit an arrest report because "[Pipkins] was not under arrest." Thuestad also testified that she completed a "traffic statistical study driver information card," more commonly known as a blue card, and turned it in. Thuestad stated she turned in the blue card "[b]ecause this was the card that you do in lieu of writing someone citations." Thuestad stated she did not fail to document Pipkins's detention because "[d]etention was documented on the blue card." Thuestad maintained that, since Pipkins was not in custody, she "didn't need to ask a watch commander to release him without charging. He wasn't being charged."

¶ 16    Officer Belmontes testified that, on the way to the police station, Pipkins blurted out, "I can get you a gun." Once they arrived at the police station, Officer Belmontes took Pipkins to the processing room. He asked Pipkins about the gun he had mentioned during transit. Pipkins told Officer Belmontes he needed to make a call. Officer Belmontes relayed this information to Thuestad. Officer Belmontes and Thuestad returned to the processing room and verified the information. Pipkins used his cell phone to make phone calls about the gun in the presence of both Officer Belmontes and Thuestad. Officer Belmontes testified that none of the phone calls were about getting a ride home from the police station. Officer Belmontes testified that "[his] understanding was that somebody had placed a gun for us to go recover it."

¶ 17    After Pipkins told them the location of the gun, Officer Belmontes and Thuestad left Pipkins handcuffed in the processing room and proceeded to the location. Officer Belmontes testified that once they arrived at the location, he went to look for the gun. He saw Thuestad talking with an individual in the alley. Officer Belmontes testified that, when he asked Thuestad about the conversation, she told him, "Don't worry about it. I got it." Officer Belmontes testified that they left the location but returned approximately three to four times to look for the gun. Each time they returned, Thuestad spoke with the same individual in the alley. Once the gun was recovered, Officer Belmontes and Thuestad returned to the police station. The gun was inventoried, and Pipkins was released.

¶ 18    Officer Belmontes testified that he did not fill out the case report. He provided Thuestad with information to incorporate into the police report, but he did not read the report because he was upset and "didn't want anything to do with it."

¶ 19    Rogers testified he is married to Pipkins's aunt. Rogers stated that Pipkins called him and told him he "wanted a gun." Rogers had a gun he purchased from a store, and he had a Firearm Owner's Identification Card. Rogers testified that he had more than one conversation with Pipkins about the gun. Rogers agreed to provide the gun and place it the garbage can in the alley behind Pipkins's grandmother's house. Rogers drove to the agreed location, placed his gun in the alley, and waited in the backyard for the officers to arrive. Rogers saw a police car arrive with a male officer and a female officer. Rogers identified the officers as Officer Belmontes and Thuestad. Rogers testified that he spoke with Thuestad and asked her what they were going to do with the gun and how long it would take for Pipkins to be released. Rogers testified that Thuestad told him Pipkins would be let go in about thirty minutes. Rogers saw Thuestad pick up the gun. Rogers went to the 10th District approximately two days later to report the incident.

¶ 20    Sergeant Rafael Martinez testified that, on December 8, 2015, he reviewed and approved a case report regarding a gun recovery that was prepared by Thuestad. Sergeant Martinez testified that he had not been aware that Pipkins was detained in the processing room. He testified that he never authorized Thuestad to release Pipkins without charges and was not informed about the

circumstances surrounding the recovery of the gun. Shortly after December 8, 2015, Sergeant Martinez learned that there was a complaint from a civilian about a handgun.

¶ 21    Lieutenant Sean Rice testified about the CPD rules and orders at issue in the case. Prior to his retirement, Lieutenant Rice was the commanding officer of the special investigations at the BIA. Special Order S04-14-03 mandates that if someone has a suspended license, they will be issued a citation. Special Order S04-14-05 details the procedure for bringing in someone arrested for a traffic violation. Per the order, if someone does not have a valid license, they are brought to the police station. When an arrestee is brought into the station, a supervisor should be notified immediately. There is a prisoner sign-in log which is used to inform the supervisor that someone is being held. Lieutenant Rice also testified that Special Order S06-01-01 states that if someone who is arrested is to be released without charging, a supervisor makes the final decision.

¶ 22    Lieutenant Rice testified that Special Order S04-14-09 requires a blue card be completed in order to keep statistics on race, location, and time of a traffic stop. Blue cards are not meant to document detentions or act as a substitute for an arrest report. Instead, blue cards are used to track statistics on racial profiling. Lieutenant Rice further testified that a traffic stop begins the moment an officer turns on the lights in an attempt to pull someone over and ends "when the driver is free to leave or when taken into physical custody."

¶ 23    Commander Joseph Bird testified that Rule 14 relates to "making a false report, whether oral or written." There are two elements required to sustain a Rule 14 violation: (1) willful and (2) material. Willful means "[t]he officer at the time of making the statement intentionally made a false statement." Material means "that it's crucial to the investigation at hand." Commander Bird testified that a Rule 14 violation affects an officer's ability to carry out the mission of CPD as "[o]fficers are expected to be trustworthy in the completion of their reports and investigations and the testimony they provide." Commander Bird further testified that, since 2008, CPD has recommended discharge for Rule 14 violations that are sustained.

¶ 24    The Superintendent also introduced pictures of the area the gun was recovered, the call records for Pipkins and Rogers, the transcripts for Thuestad's the BIA interviews, and surveillance

video from the 10th District station on December 8, 2015. The video showed Thuestad entering and exiting the processing room several times.

¶ 25    Thuestad submitted seven letters of support and called three mitigation witnesses. Cecil Smith, the current Chief of Police for Sanford, Florida, spent twenty-five years at the Elgin Police Department. Smith testified he had been a "father figure" to Thuestad ever since she joined the Elgin Explorer Program at age fourteen. Smith testified that he had no concerns as to Officers Thuestad's integrity and that she served as an example for young people. He also testified that Thuestad was someone the Chicago Police Department could depend on "to do what's right."

¶ 26    Donna Dowd, a former Commanding Officer of the Alternate Response Section at the CPD, testified that Thuestad worked under her command from late 2015 until 2019. Dowd selected Thuestad to be a part of her immediate staff. Dowd testified that she picked people who had integrity and were trustworthy. Dowd stated that Thuestad's actions and character in the role reinforced that she had made the right decision. Dowd testified there was a "difference between misconduct and mistake", and that Thuestad was a valuable asset that would be a loss to the Department if discharged.

¶ 27    Nicolas Garcia, a detective in the Violent Crimes Division, testified that he previously worked with Thuestad. Detective Garcia testified Thuestad was "a very well-rounded officer." She was courageous, and she put herself second to everyone. In his opinion, Thuestad's integrity was "a hundred percent," and "above and beyond the integrity of the whole department."

¶ 28    Thuestad also presented evidence of her complimentary history, which included 89 awards. She also had no sustained complaints on her disciplinary history.

¶ 29    On May 26, 2022, the Board issued its findings and decision. The Board found Thuestad guilty of four of the five charges. The Board found Thuestad guilty of charge 1 for violating four CPD rules, including Rule 14, as "the narrative provided by [Thuestad] in the Original Case Incident Report [did] not accurately reflect the events that occurred" and "contain[ed] materially false statements and omissions." Specifically, the Board found that Thuestad's narrative gave "the false impression that there was one continuous uninterrupted event whereby after making the

traffic stop, [Thuestad] and Officer Belmontes went to the designated location and retrieved a gun." The narrative omitted that Pipkins was detained at the police station and that he made phone calls in the processing room to make arrangements for the gun. The Board stated that Thuestad "intended to conceal all the circumstances of Mr. Pipkins detainment." The Board found Thuestad's explanation "not credible." The Board found Thuestad guilty of charge 2, finding she violated CPD rules when she released Pipkins from custody and did not issue a citation without notifying her supervisor. The Board did not find Thuestad's testimony credible, and it noted that Thuestad "released Mr. Pipkins without charging him or giving him a citation because he successfully made arrangements for [Thuestad] to retrieve a gun." The Board found Thuestad guilty of charge 4, finding she did not notify her supervisor she had detained Pipkins at the police station. Finally, the Board found Thuestad guilty of charge 5, finding she provided false statements to BIA investigators. Specifically, the Board found: "Her statements to BIA were materially false and she knew they were false. They were made to further cover-up the fact that Mr. Pipkins was making arrangements for a gun to place at a designated location where she could retrieve it."

¶ 30    In assessing the penalty, the Board considered Thuestad's mitigation evidence, which consisted of letters of support and testimony from witnesses, as well as her complimentary history and no sustained complaints on her disciplinary history. The Board found that the mitigation evidence "[did] not outweigh the seriousness of the misconduct in this case." Her conduct, it explained, was "incompatible with continued services as a police officer and warrant[ed] her discharge from the Chicago Police Department. Specially, the Board determined:

> "[Thuestad] abused her authority as a police officer and knowingly and intentionally falsified an official police report as part of a scheme to recover a gun under false pretenses. Such conduct by [Thuestad] is antithetical to that expected and required of a police officer, who at all times has a duty to act with honesty and intregrity, not falsify a report and give a false impression as to the circumstances leading to a gun recovery. [Thuestad] also attempted to cover up her misconduct by making an intentional

materially false statement during her interview with Bureau of Internal Affairs.

[Thuestad's] actions and dishonesty relate directly to her public duties as a police officer and render her unfit to hold that office. Her treatment of Mr. Pipkins brought discredit upon the Chicago Police Department, thereby undermining public confidence in the judgment of its officers and the Department's mission. Effective law enforcement depends upon a high degree of cooperation between the police department and the public it serves. Conduct such as [Thuestad's] erodes the public's trust of and confidence in police officers, thereby impeding the department's efforts to achieve the important goal of reducing crime. In addition, trustworthiness, reliability, good judgment, and integrity are all material qualifications for any job, particularly one as a police officer. The duties of a police officer include making arrests and testifying in court, and a police officer's credibility is at issue in both the prosecution of crimes and in the Police Department's defense of civil lawsuits. A public finding that a police officer falsified an official report and knowingly made a false official statement to BIA is detrimental to the officer's credibility as a witness and, as such, is a serious liability to the Department. [Citation.]

The Board finds that [Thuestad's] conduct is sufficiently serious to constitute a substantial shortcoming that renders her continuance in her office detrimental to the discipline and efficiency of the service of the Chicago Police Department and is something that the law recognizes as good cause for her to no longer occupy her office."

The Board unanimously ordered Thuestad discharged for cause.

¶ 31    On June 28, 2022, Thuestad filed a complaint for administrative review. Thuestad argued that the Board's findings were against the manifest weight of the evidence and its decision to

discharge her from duty was arbitrary and capricious. On October 6, 2023, the circuit court reversed the findings and decision of the Board and ordered that Thuestad be reinstated. On October 18, 2023, the circuit court modified the October 6 order to include an award of backpay, and it denied the Superintendent's motion for a stay pending appeal.

¶ 32    The Superintendent appealed. At his request, and over Thuestad's objection, we stayed the circuit court's judgment pending a decision on appeal.

¶ 33                                    ANALYSIS

¶ 34    On appeal, we review the administrative agency's decision and not the decision of the circuit court. *Krocka v. Police Board of the City of Chicago*, 327 Ill. App. 3d 36, 46 (2001). When reviewing the Board's decision regarding discharge we utilize a two-step analysis. *Id.* First, we must determine whether the Board's findings are against the manifest weight of the evidence. *Id.* Second, we must determine whether the Board's findings of fact provide a sufficient basis for its decision of discharge. *Id*. Accordingly, " 'the agency's decision as to cause will not be reversed unless it is arbitrary, unreasonable, or unrelated to the requirements of service.' " *Id*. (quoting *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d, 547, 552 (1981)).

¶ 35                          I. The Board's Factual Findings

¶ 36    The Board's findings and conclusions on questions of fact must "be held to be prima facie true and correct" on review. 735 ILCS 5/3-110 (West 2020). When examining its factual determinations, we do not reweigh the evidence nor do we substitute our own judgment for that of the Board. *Orsa v. Police Board of the City of Chicago*, 2016 IL App (1st) 121709, ¶ 17; see *Gounaris v. City of Chicago*, 321 Ill. App. 3d 487, 490 (2001) ("Because the weight of the evidence and the credibility of witnesses are uniquely within the province of the administrative agency, there need only be some competent evidence in the record to support its finding."). Our role "is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence." *Cinkus v. Village of Stickney Municipal Officers Election Board*, 228 Ill. 2d 200, 210 (2008). The

Board's decision regarding the factual findings is only contrary to the manifest weight of the evidence "if, after reviewing the evidence in a light most favorable to the agency, we conclude that no rational trier of fact could have agreed with the agency's decision and an opposite conclusion is clearly evident." *Daniels v. Police Board of the City of Chicago*, 338 Ill. App. 3d 851, 858 (2003). We

¶ 37    Here, after reviewing the record, we conclude that the Board's factual findings were supported by the record and were not against the manifest weight of the evidence. The Board's first finding was that Thuestad violated CPD rules, including Rule 14, when she submitted a report that "[did] not accurately reflect the events the occurred, and that it contain[ed] materially false statements and omissions." Thuestad admitted she wrote the report. The report's narrative stated that, during a traffic stop, Pipkins told officers he "observed an unknown male black place, what [he] believed to be, a handgun near the pink line tracks." Based on the record, all conversations regarding the gun and its retrieval occurred after the traffic stop had ended. Pipkins initially told officers that he knew where a "gun was laid up" during transport to the police station. Testimony from Officer Belmontes and Rogers confirmed that there were steps taken to recover the gun. Officer Belmontes testified that there were several phone calls made in the presence of both him and Thuestad regarding the gun. The record shows that the gun was recovered after Pipkins made phone calls arrange for the gun to be placed behind his grandmother's house. Rogers placed the gun in the location and waited for officers to arrive. Further, Rogers testified that he spoke with Thuestad in the alley about the gun and Pipkins's release. Rogers was able to identify her and Officer Belmontes in a photo array.

¶ 38    The Board found that Thuestad's testimony about the duration of the traffic stop was not credible and that "[t]he traffic stop made by [Thuestad] ended when Mr. Pipkins was handcuffed, placed in the police vehicle, and taken to the police station where he was not free to leave." However, Thuestad argues that Pipkins was never under arrest, and therefore he was never "placed in physical custody." According to Thuestad, the term "traffic stop" encompasses the time period starting from when officers curbed the vehicle and ending when Pipkins was released from the

police. As explained by Lieutenant Rice, per CPD order, a traffic stop ends when the individual is taken into custody. The report omits the fact that Pipkins was taken into custody and remained at the police station for approximately an hour and half before he was released.

¶ 39    Next, the Board found that Thuestad violated CPD rules when she decided not to issue a citation or arrest Pipkins and released him without her supervisor's approval. As explained during the hearing, Thuestad did not have the discretion to release Pipkins without notifying her supervisor. Lieutenant Rice identified several general and special orders providing that, for the offense of driving on a suspended license, an officer must either arrest the driver or issue a citation. Additionally, an arresting officer cannot release someone without first notifying their supervisor.

¶ 40    Additionally, Thuestad's own testimony established she disobeyed CPD directives when she did not document Pipkins's arrest and released him without charges. She admitted that she did not issue any citations to Pipkins or complete an arrest report. Thuestad also admitted that she did not notify her supervisor that she was releasing Pipkins without charges. Further, Sergeant Martinez testified that he was not notified that Pipkins was in custody in the processing room and that Thuestad did not consult with him prior to releasing Pipkins without charges. The only documentation of Pipkins being detained was the blue card, which, based on Lieutenant Rice's testimony, is not a substitute for an arrest report.

¶ 41    Finally, the Board found that Thuestad violated CPD rules when she provided statements to the BIA that were "materially false and she knew they were false." In her statement to the BIA, Thuestad maintained that the "traffic stop" spanned the entire encounter with Pipkins from the time his car was stopped until his release from the police station. Thuestad stated that she was only present for one phone call, which Pipkins made to arrange for a ride from the police station. As previously noted, however, other evidence showed that Thuestad was present when Pipkins was making calls arranging for a gun to be placed in the alley.

¶ 42    The evidence supported the Board's factual findings. Accordingly, based on our review of the record, we find it was not against the manifest weight of the evidence for the Board to

determine that Thuestad violated CPD rules and regulations regarding the conduct of police officers.

¶ 43                        II. Exclusion of Evidence

¶ 44    Thuestad argues that the Board's finding of guilt on charges 1 and 5 should be overturned because the Hearing Officer erroneously excluded from evidence General Order G8-01-01 (eff. May 4, 2018), which, she asserts, prohibits charging violations of Rule 14 if the officer was not given the chance to review relevant videos during the BIA's investigation. She contends that this exclusion "denied Thuestad her right to develop [a] challenge to any Rule 14 charge." The Superintendent argues Thuestad waived this argument as she did not raise it before the Board. We agree.

¶ 45    "It is quite established that if an argument, issue, or defense is not presented in an administrative hearing, it is procedurally defaulted and may not be raised for the first time before the circuit court on administrative review." *Cinkus*, 228 Ill. 2d at 212-13. "This rule prevents unfair surprise and it allows the administrative agent to have the opportunity to construe rules and statutes which most directly concern the agency's position." *Skale v. Illinois Department of Public Aid*, 165 Ill. 3d 776, 780 (1987). Our review of the record shows that Thuestad did not make this argument during proceedings before the Board and is raising the issue for the first time on administrative review. Accordingly, she procedurally defaulted this issue, and we decline to address it.

¶ 46                        III. Cause for Discharge

¶ 47    Next, we consider whether the Board's findings of fact provide a sufficient basis for its decision that cause for discharge existed. *Krocka*, 327 Ill. App. 3d at 46. A police officer may not be discharged without cause. 65 ILCS 10-1-18(a) (West 2022). "Cause" has been defined as " 'some substantial shortcoming which renders the employee's continuance in office in some way detrimental to the discipline and efficiency of the service and which the law and sound public opinion recognize as good cause for his no longer holding the position.' " *Kappel v. Police Board*

*of the City of Chicago*, 220 Ill. App. 3d 580, 589 (1991) (quoting *Department of Mental Health*, 85 Ill. 2d at 551). As the Board is in the best position to determine the effects of an officer's conduct on the department, we give "heavy deference" to its determination of cause. *Orsa*, 2016 IL App (1st) 121709, ¶ 60. Additionally, "we may not consider whether we would have imposed a more lenient disciplinary sentence." *Krocka*, 327 Ill. App. 3d at 48 (citing *Wilson v. Board of Fire & Police Commissioners of the City of Markham*, 205 Ill. App. 3d 984, 992 (1990)). Our "[r]eview is limited to a determination of whether the Board acted unreasonably or arbitrarily by selecting a type of discipline that was inappropriate or unrelated to the needs of the service." *Id.* (citing *Wilson*, 205 Ill. App. 3d at 992).

¶ 48    "Trustworthiness, reliability, good judgment, and integrity are all material qualifications for any job, particularly one as a police officer." *Village of Oak Lawn v. Human Rights Comm'n*, 133 Ill. App. 3d 221, 224 (1985). Further, "as the guardians of our laws, police officers are expected to act with integrity, honesty, and trustworthiness." *Sinderman v. Civil Service Comm'n*, 275 Ill. App. 3d 917, 928 (1995). It has been recognized that

> " '[a] police officer's credibility is inevitably an issue in the prosecution of
> crimes and in the Chicago police department's defense of civil lawsuits. A
> public finding that an officer had lied on previous occasions is detrimental
> to the officer's credibility as a witness and as such may be a serious liability
> to the department.' " *Taylor v. Police Board of the City of Chicago*, 2011 IL
> App (1st) 101156, ¶ 51 (quoting *Rodriguez v. Weis*, 408 Ill. App. 3d 663,
> 671 (2011)).

¶ 49    Here, the Board considered Thuestad's mitigation evidence, which included letters of support, a complimentary history, awards, and lack of sustained complaints on her disciplinary record. The Board found that this mitigation evidence "[did] not outweigh the seriousness of the misconduct in this case." Further, the Board found that Thuestad's "misconduct [was] incompatible with continued service as a police officer and warrant[ed] her discharge from the Chicago Police Department." The Board noted that Thuestad "abused her authority as a police officer and

knowingly and intentionally falsified an official police report as part of a scheme to recover a gun under false pretenses." The Board found Thuestad's conduct to be "antithetical to that expected and required of a police officer, who at all times has a duty to act with honesty and integrity." The Board also found that Thuestad's conduct was "sufficiently serious to constitute a substantial shortcoming that renders her continuance in office detrimental to the discipline and efficiency of the Chicago Police Department and is something that the law recognizes as good cause for her to no longer occupy her office."

¶ 50    The Board found that Thuestad violated Rule 14, which prohibits CPD officers from making false reports, whether written or oral. "An officer's violation of a single rule has long been held to be a sufficient basis for termination." *Siwek*, 374 Ill. App. 3d at 738 (collecting case). Courts have recognized that cause for discharge exists where a police officer has filed a false report or lied to his employer. See *Sindermann*, 275 Ill. App. 3d at 928-29; *Nelmark v. Board of Fire & Police Commissioners of the City of DeKalb*, 159, Ill. App. 3d 751, 759 (1987). Yet, Thuestad argues the Board's decision "was clearly unreasonable, arbitrary, and unjust even if she had been guilty of any of the charges." Thuestad argues that the finding for cause is arbitrary and unreasonable compared to the discipline imposed on Officer Belmontes and Sergeant Martinez. However, "the fact that different individuals have been disciplined differently is not a basis for concluding that an agency's disciplinary decision is unreasonable; such conclusions are appropriate when individuals receive different discipline in a single, identical, 'completely related' case." *Siwek*, 374 Ill. App. 3d at 738 (quoting *Launius v. Board of Fire & Police Commissioners of the City of Des Plaines*, 151 Ill. 2d 419, 441-42 (1992)). While Officer Belmontes and Sergeant Martinez were involved in the same incident, they cooperated with BIA investigators and did not provide false statements. Thuestad not only authored a false police report, she provided false statements to the BIA investigators. We are unpersuaded by Thuestad's assertion that the Board's decision was arbitrary or unreasonable as "cause for discharge can be found regardless of whether other employees have been disciplined differently." *Launius*, 151 Ill. 2d at 442.

¶ 51    Therefore, we conclude that the Board's finding of cause for discharge was not arbitrary, unreasonable, or unrelated to the requirements of Thuestad's service as a police officer.

¶ 52                              CONCLUSION

¶ 53    For the reasons set forth above, we reverse the decision of the circuit court and reinstate the Board's decision discharging Thuestad from her position as a Chicago police officer.

¶ 54    Circuit court judgment reversed.

¶ 55    Board decision affirmed.