2025 IL App (1st) 231738-U

THIRD DIVISION
March 12, 2025

No. 1-23-1738

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

**IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT**

| | |
|---|---|
| THOMAS SHERRY, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Cook County |
| | ) |
| v. | ) No. 22 CH 12614 |
| | ) |
| THE POLICE BOARD OF THE CITY OF CHICAGO and | ) Honorable |
| LARRY SNELLING, Superintendent of Police, | ) Thaddeus L. Wilson, |
| | ) Judge, Presiding. |
| Defendants-Appellees. | ) |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Lampkin and Justice Martin concurred with the judgment.

**ORDER**

¶ 1     *Held*: We affirm the decision of the Police Board of the City of Chicago to discharge plaintiff for authoring and submitting false and/or misleading reports where the Board's findings were not against the manifest weight of the evidence, and plaintiff received due process and a fair hearing before the Board.

¶ 2     Plaintiff Thomas Sherry appeals the trial court's order, on administrative review, affirming defendant Police Board of the City of Chicago's (Board) decision to discharge plaintiff for actions taken in connection with the arrests of Anthony Castro and Jose Hermosillo. On appeal, plaintiff contends that the Board's decision to discharge him constituted error where (1) the Board's finding

that he violated Chicago Police Department Rules (CPD Rules) was against the manifest weight of the evidence, (2) the Board's finding that cause existed to discharge him was arbitrary, unreasonable, or unrelated to the requirements of police service, and (3) the Board's hearing deprived plaintiff of his right to due process. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     We set forth the following facts taken from the administrative proceedings in this matter.

¶ 5     Plaintiff testified that he began working as a Chicago police officer in 1997. In June of 2004, he was assigned to the Special Operations Section (SOS).

¶ 6     On July 27, 2004, plaintiff was assigned to work with Officer Jerome Finnigan, who was not his regular partner. This was the first time he had worked with Finnigan. That day, plaintiff and Finnigan, along with Officers Timothy McKeon, Matthew Riley, Keith Herrera, and John Hurley, went to Castro's residence. Plaintiff testified that when he arrived at the residence, he learned that the officers had received a tip that Castro possessed firearms and narcotics. Plaintiff stayed outside while other officers entered the building.

¶ 7     Plaintiff later encountered Castro outside of the building and he escorted Castro inside to his residence. When they arrived at Castro's apartment, other officers, including Finnigan, were already inside the residence. Plaintiff "handed Castro off" to Finnigan in the foyer of the apartment and that was the extent of their interaction. Plaintiff later learned that the officers inside conducted a search of Castro's apartment. He did not participate in the search and was not aware of any search warrant obtained by the police. He assumed a consent to search had been obtained by the officers. Plaintiff testified that since he was not Finnigan's regular partner, he "allowed them to head their investigation the way they [saw] fit."

¶ 8    Plaintiff and Finnigan transported Castro in the back seat of their police vehicle, but he was not taken to the police station. Plaintiff testified that he did not believe at the time that Castro was under arrest. Instead, he thought Castro was in the vehicle "voluntarily." Plaintiff testified that he did not know Castro had been arrested until the "end of the night" when he filled out his overtime slip. He testified that during the ride, Castro gave information about other individuals dealing in narcotics and identified an apartment building where someone named "Primo" resided. Officers Herrera and Hurley transported Castro to the police station for processing while other officers, including plaintiff, set up surveillance near Primo's apartment building.

¶ 9    Plaintiff walked around the apartment building while surveying the area. After a couple of hours, he went inside the building "making announcements and banging on [walls] and calling out [Primo's] name." Someone above plaintiff in the stairway answered. Plaintiff identified himself as a police officer and the person fled. Plaintiff chased the person up the stairs and into an apartment where he subdued the person in the kitchen. Plaintiff placed handcuffs on the individual, who was later identified as Hermosillo.

¶ 10    Soon after plaintiff subdued Hermosillo, Finnigan appeared in the kitchen with a Nike shoebox containing cocaine. He claimed he had found the box a few feet from where plaintiff and Hermosillo were located. Plaintiff testified that as far as he knew, no search had been conducted of Hermosillo's apartment at the time. Plaintiff had not seen the shoebox until Finnigan showed it to him. Plaintiff later discovered that the shoebox was actually found in Castro's residence, not Hermosillo's apartment. Finnigan and plaintiff transported Hermosillo to the police station for processing.

¶ 11    Plaintiff prepared three reports in connection with Hermosillo's arrest. The inventory report listed a shoebox "containing nine miscellaneous size clear bags" filled with "suspect

cocaine." Although there was also an unopened piece of mail in the box, the report did not mention this evidence. In a subsequent interview with investigating officers, plaintiff explained that the envelope might have been underneath the plastic bags, and he was hesitant to move the bags because he did not want to contaminate the evidence. He stated that he had observed only the bags.

¶ 12    The report also stated that the box belonged to Hermosillo and was recovered from his apartment. The report stated that plaintiff "found" the box, although he acknowledged that he did not find the shoebox. Plaintiff explained that completing the inventory form was not "a summary of the actions" but rather was "used for tracking." He testified that "if I was holding onto the property that I was inventorying it [*sic*], then I would have probably put my name on it as I was completing the form."

¶ 13    The arrest report listed plaintiff and Finnigan as the arresting officers. Plaintiff testified that he completed the heading, the first line in the narrative, and the portion that identified him and Finnigan as the arresting officers. Plaintiff stated, however, that he did not complete the narrative contained in the arrest report, nor did he actually sign the report. The signature on the report did not belong to plaintiff. He believed that Finnigan completed the narrative portion because it was "Officer Finnigan's case. This was his information and follow-through. This wasn't mine to omit."

¶ 14    Although plaintiff gave the report to Finnigan to complete, he did not review the narrative after it was completed. He understood that an arrest report was necessary to complete an arrest, and he had access to the report. However, he trusted Finnigan to tell the truth about the incident. Plaintiff did not "believe there was anything untoward or illegal about what my partner was doing at the time."

¶ 15    Plaintiff similarly testified regarding the case report, which was also required for the incident. He testified that he did not complete the report or review it before it was submitted. He

also did not give Finnigan permission to file either report without his review. Although his name appeared as a signature on the case report, plaintiff testified that he did not sign it. Plaintiff testified that his interactions with Finnigan were "minimal at best." He did not review the case report and at the time was not "under the impression that anything was misleading or false about it."

¶ 16    The narrative in the case report and arrest report stated that officers encountered Hermosillo outside of the building and Hermosillo dropped the Nike shoebox as he fled. Plaintiff testified that had he read the narrative in the reports, he would have known it was false because he did not encounter Hermosillo outside of the building, nor did he observe Hermosillo carrying the shoebox or dropping it when he fled.

¶ 17    Plaintiff acknowledged that he allowed Finnigan to complete the reports because it was Finnigan's investigation and "[i]t was his information that he was operating on." At the time, he did not believe he should question Finnigan's work. Although plaintiff had a "personality dispute" with Finnigan in that he did not like how Finnigan spoke to people, he trusted Finnigan "to do what's legal and right and just." Plaintiff testified that he did not report Finnigan or the other officers for wrongdoing because he "wasn't aware of any illegal activity at that time."

¶ 18    Lieutenant Robert Flores, a supervisor with the Bureau of Internal Affairs (BIA), testified regarding CPD rules and regulations. The BIA investigates allegations of CPD rule violations and takes disciplinary action against officers when necessary. Flores testified that the rules set forth prohibited police conduct and must be followed by the officers.

¶ 19    Relevant here, Flores testified about Rule 14, which is the prohibition against submitting a false written or oral report. To sustain a Rule 14 violation, the officer's conduct must be willful and material. Flores explained that "[w]illful basically means intentional, it is not a mistake, it is

not error. The member intentionally lied or made a false report." The false subject matter must be "substantive" and not "just a trivial fact."

¶ 20    Flores testified that the accuracy of police reports is important because they are often used by testifying officers to refresh their memory of the incident. Furthermore, an officer found to have violated Rule 14 "faces numerous restrictions in their ability to carry out their duties." Flores testified that such violations could affect an officer's credibility at trial, as well as his or her ability to perform administrative functions requiring a signature. Officers with sustained Rule 14 violations also decrease public trust in police officers because "the public would know that they've been found to be dishonest."

¶ 21    Flores agreed that officers are responsible for the accuracy of information contained in the report if their name appears on the document. Even if a different officer completed the report, if a person's name appears on the report and the report is submitted, both officers have adopted the report. When asked whether an officer violates Rule 14 if he or she adopts the false report of a partner, Flores responded, "yes." Flores testified that arrest reports typically list and are signed by two arresting officers.

¶ 22    On cross-examination, Flores acknowledged that there were no general or special police orders directing that every officer whose name appears on a police report has adopted the report. Flores also stated that he had no knowledge of whether plaintiff willfully or intentionally submitted a false report in this case.

¶ 23    After the arrests of Castro and Hermosillo, the Chicago Police Department (Department) received an anonymous complaint alleging an illegal arrest by the SOS. On November 28, 2005, BIA Sergeant Maureen Kennedy requested a preliminary investigation of the complaint. Investigating officers reviewed the arrests of Castro and Hermosillo occurring on July 27, 2004,

and involving SOS officers Finnigan, Herrera, Hurley, McKeon, Riley, and plaintiff. As part of the investigation, the shoebox associated with Hermosillo's arrest was tested for fingerprints. While handling the evidence, an analyst found an unopened envelope in the shoebox addressed to Castro.

¶ 24    On December 19, 2005, Complaint Register Number (CR 310780) was obtained for the investigation. The investigation became known as "Operation Broken Oath" and was expanded to include members of other SOS sections accused of "misconduct ranging from false Chicago Police Department reports, home invasions, thefts, and conspiracy to commit murder."

¶ 25    In 2007, Castro and Hermosillo each filed a complaint in federal court against the city of Chicago and Officer Finnigan and plaintiff. CPD opened an internal investigation based on the allegations in the complaints. However, Castro and Hermosillo refused to participate in the investigation and sworn affidavits could not be obtained. As a result, the allegations against Finnigan and plaintiff were deemed "Not Sustained." The FBI took over the investigation in 2007.

¶ 26    Meanwhile, plaintiff and Finnigan had been arrested on September 7, 2006, and charged with home invasion, aggravated kidnapping, and official misconduct in connection with the arrests of Castro and Hermosillo. Plaintiff was relieved of his police powers but remained an employee of the Department. The criminal charges against plaintiff were dismissed in 2009, and he returned to work on March 17, 2009. Finnigan was convicted and received a prison sentence.

¶ 27    The last criminal case against former SOS members concluded in January 2013. The Department received documents pertaining to the criminal proceedings and sought to review the evidence for possible administrative misconduct. On February 13, 2014, the BIA received authorization from then-police superintendent Garry McCarthy to investigate officers including plaintiff for administrative misconduct related to Operation Broken Oath. Such authorization was

required because "the allegation is more than five (5) years old *** [and] may not proceed unless authorized by the Superintendent of Police." The BIA resumed investigation of the officers involved, including plaintiff, who were not convicted of a crime and remained CPD employees. As part of the investigation, BIA received documents from the FBI, the last of which was received in July 2014.

¶ 28 On October 11, 2018, BIA Sergeant Wilfredo Torres served plaintiff with formal allegations of misconduct. Based on his investigation, Torres concluded that "SOS members searched Mr. Castro's home without a warrant and then planted cocaine at Mr. Hermosillo's residence, and that they took thousands of dollars from the two homes and split it among themselves. The evidence shows [plaintiff] was present for all of this misconduct." Torres recommended that plaintiff be discharged from the CPD for his misconduct.

¶ 29 On November 23, 2020, superintendent David Brown filed seven charges against plaintiff and recommended that the Board discharge him from employment. The charges alleged that plaintiff violated the following CPD Rules:

> "Rule 1: Violation of any law or ordinance.
>
> Rule 2: Any action or conduct which impedes the Department's efforts to achieve its policy and goals or brings discredit upon the Department.
>
> Rule 3: Any failure to promote the Department's efforts to implement its policy or accomplish its goals.
>
> Rule 6: Disobedience of an order or directive, whether written or oral.
>
> Rule 14: Making a false report, written or oral."

¶ 30 The first three charges alleged violations of Rules 1, 2, 3 and 6 in connection with the illegal search of Castro's and Hermosillo's residences and the excessive detention of Castro in a

police vehicle. The next three charges alleged violations of Rules 2, 6 and 14 regarding plaintiff's authoring and submission of false and/or misleading case, arrest and inventory reports in connection with Hermosillo's arrest.

¶ 31    The last charge alleged that plaintiff "failed to promptly notify the Department of misconduct by Jerome Finnigan, Keith Herrera, and/or John Hurley *** including but not limited to searching without a valid warrant or consent to search; and/or arresting Jose Hermosillo for possession of narcotics when in fact those narcotics had been recovered from the residence of Anthony Castro and not Jose Hermosillo; and/or recovering narcotics and failing to properly inventory them[.]" The superintendent deemed this conduct "contrary to the policy, orders, or directives of the Department."

¶ 32    Plaintiff moved to dismiss the charges, arguing that the investigation violated CPD General Order 93-03, which requires a "prompt and thorough investigation," as well as the collective bargaining agreement and his right to due process. The Board denied the motion, finding that even if the investigation violated General Order 93-03, such a violation was not grounds for dismissal of the charges. The investigation also did not violate the collective bargaining agreement because the superintendent authorized the investigation in writing as required. The Board found that plaintiff's due process rights were not violated where his alleged conduct was not sufficiently similar to Officer McKeon, who received no punishment, and where the length of time between the incident and the filing of charges did not merit the application of *laches*. The Board further found that *res judicata* did not bar the superintendent's action where the prior closing of the complaint registers did not constitute judgment on the merits.

¶ 33    One board member dissented. She believed that the lengthy delay in filing charges against plaintiff was "extraordinary and egregious" and constituted a violation of the General Order.

¶ 34    On June 27-28, 2022 and July 15, 2022, the Board held a hearing on the charges. It issued its ruling on December 15, 2022. The Board found plaintiff not guilty of charges 1, 2 and 3. The Board determined that the superintendent provided insufficient evidence that plaintiff knew Castro's residence had been searched illegally or that he participated in the illegal search, and that Castro was arrested when he rode in the police vehicle with plaintiff and Finnigan. The Board also found that "[t]here is next-to-no evidence that [plaintiff] unlawfully searched Hermosillo's residence."

¶ 35    However, the Board found plaintiff guilty of the remaining charges. The Board ruled that plaintiff violated Rules 2 and 14 by authoring and submitting false and/or misleading case and arrest reports in connection with Hermosillo's arrest. The Board found that the narrative contained in the case and arrest reports was "demonstrably false," and plaintiff admitted that it was false. He knew that Hermosillo did not drop a box containing narcotics outside while plaintiff chased him. He also knew that narcotics were recovered from the residence of Castro, not from Hermosillo.

¶ 36    The Board further found that the false statements were material and willfully made. Although plaintiff testified that it was common practice for officers to sign a report on behalf of another officer, he acknowledged that he should have reviewed the reports to ensure their accuracy. He also would not allow someone to sign and submit a report on his behalf without first reviewing it. However, according to plaintiff, that is what occurred in this case. He testified that he never asked to look at the reports because he had no reason to believe that they contained false or misleading statements.

¶ 37    The Board did not find plaintiff's testimony credible, especially that "on his first night working with Officer Finnigan, [he] did not review this report *and* did not know the report's contents." (Emphasis in the original.) The Board explained that "[e]ven if [plaintiff] had no reason

to believe 'anything was misleading or false,' it does not follow that [plaintiff]—contrary to his common practice—would have so easily trusted Officer Finnigan that he would not have reviewed the report on that particular night." The Board concluded that plaintiff "knew about Officer Finnigan's actions, ceded to Officer Finnigan's pressure by burying his head in the sand, and intentionally did not fill out the rest of the report, instead leaving it to another officer to complete the report in a manner that was consistent with the cover-up narrative developed to protect the police officers."

¶ 38    Regarding the inventory report, the Board found plaintiff guilty of violating Rules 1, 6 and 14, noting it also contained the false statement that the narcotics actually found in Castro's residence were found on Hermosillo. Plaintiff admitted that he prepared the inventory report. The Board again stated that it found plaintiff's testimony that he was "innocently blind to many of the things going on around him" not credible. However, "even putting that credibility aside," plaintiff admitted that the inventory report was inaccurate where he signed his name as the recovering officer of the shoebox when he did not recover the evidence. The Board found the false statements in the inventory report "material," because it helped form the basis of Hermosillo's arrest. The report also listed plaintiff as the recovering officer of the shoebox, which plaintiff admits was not true. Such an inaccuracy would have serious implications regarding chain of custody in a potential prosecution.

¶ 39    Lastly, the Board found plaintiff guilty of failing to notify the Department of any of the events related to the arrests of Castro and Hermosillo. The Board reiterated that it found plaintiff's testimony that he "wasn't aware of any illegal activity," or that there "was nothing to report," disingenuous. Although he claimed he was not aware that Castro's home had been searched, he knew that officers entered Castro's home, and they did not have a search warrant. Plaintiff also

admitted that Castro was placed in their vehicle and driven around the city before being processed. He admitted that he entered Hermosillo's apartment without a warrant and failed to correct a mistake on the inventory report that "he knew about." The Board concluded that "[a]ny one of those events [was] questionable and should have given [plaintiff] pause."

¶ 40    The Board also considered the testimony of plaintiff's mitigation witnesses, as well as his complimentary and disciplinary histories. The witnesses, two sergeants and a commanding officer, testified that plaintiff had a good reputation for truthfulness and veracity, was highly motivated and a "very good" team player. Since joining the CPD in 1997, plaintiff earned 69 awards including one Special Commendation, three Department Commendations, one Unit Meritorious Performance Award, two Problem Solving Awards, and 55 Honorable Mentions. He had no sustained complaints on his disciplinary history report.

¶ 41    The Board concluded, however, that plaintiff's "accomplishments as a police officer and the mitigation witnesses' positive evaluations do not outweigh the seriousness of [his] misconduct." The Board found that making false statements on reports "could seriously affect any criminal prosecution based on CPD investigations." Plaintiff "inaccurately listed himself as the recovering officer on an inventory report—an inaccuracy so serious that it would have implications for chain of custody and jeopardize a prosecution."  Also, plaintiff's "dishonesty directly relates to his duties as a police officer and ultimately renders him unfit to hold that office." In particular, "[a] public finding that a police officer falsified official reports is detrimental to the officer's credibility as a witness and, as such, is a serious liability to the Department." The Board found plaintiff's conduct "sufficiently serious to constitute a substantial shortcoming that renders his continuance in his office detrimental to the discipline and efficiency of [the Department,]  and is something that the law recognizes as good cause" for his discharge.

¶ 42    One Board member, Steven A. Block, dissented. Block agreed with the majority's finding of not guilty on the first three charges. However, he would also find plaintiff not guilty on the remaining charges. Block noted that the signature on the case report did not match exemplars of plaintiff's handwriting. He therefore found plaintiff's testimony that he did not author the report credible. Block also did not believe that the evidence showed plaintiff acted willfully. He found it "just as likely" that Officer Finnigan "hid his deceptive and illegal behavior" from plaintiff. Finnigan could have relied on his "crew" and concealed his illegal behavior from plaintiff, who may have reported him. Block believed that "there is no evidence in the record to support a finding that [plaintiff] knew that the narcotics were found at Castro's residence and not Hermosillo's residence; therefore, he could not have willfully made this false statement." He also found no evidence contradicting plaintiff's testimony that he was not aware of any misconduct or illegal activity on the part of Finnigan or the other officers involved in Hermosillo's arrest. Block believed that "neither of those scenarios—Officer Finnigan hiding his deception from [plaintiff] or [plaintiff] choosing to ignore it—is supported by the evidence in the Record before the Board." He concluded that for the Board to find that plaintiff acted willfully in submitting the false reports, it must rely on speculation.

¶ 43    On administrative review, the circuit court affirmed the Board's decision. The court found that the evidence and plaintiff's testimony were "sufficient to circumstantially show" that plaintiff willfully submitted false case, evidence and inventory reports. The court also found that plaintiff knew officers had entered Castro's and Hermosillo's residences without a warrant, and he and Finnigan "searched throughout Chicago with Castro in the back of their squad car" without Castro having been processed. The court agreed with the Board that these events should have "given

[Plaintiff] pause." Therefore, it affirmed the Board's finding that plaintiff failed to promptly report the officers' misconduct.

¶ 44    Finally, the circuit court found that the administrative proceedings did not violate plaintiff's due process rights. The court noted that plaintiff was paid as an employee of the Department from the time of the alleged misconduct in 2004 to 2020, when the present charges were filed against him. It also found that *laches* did not apply to bar the charges where the Department reasonably delayed bringing charges against plaintiff because his case was interconnected with criminal prosecutions that did not conclude until 2013, and plaintiff failed to establish prejudice resulting from the delay.

¶ 45    Plaintiff filed this appeal.

¶ 46                                II. ANALYSIS

¶ 47                          A. *Sufficiency of the Evidence*

¶ 48    On administrative review, we review the decision of the administrative agency and not the determination of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill.2d 497, 531 (2006), as modified on denial of reh'g (May 29, 2007). Review of the Board's determination is governed by administrative review law. *American Federation of State, County and Municipal Employees, Council 31 v. Illinois State Labor Relations Board*, 216 Ill.2d 569, 577 (2005). On administrative review, our standard of review depends on whether the issue involves a question of law, a question of fact, or a mixed question of law and fact. *Id*. The Board's findings of fact are considered *prima facie* true, and we will not reverse the Board's fact findings unless they are against the manifest weight of the evidence. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. A factual determination is against

the manifest weight of the evidence if the opposite conclusion is clearly evident. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008).

¶ 49    The Board's decision to terminate an employee for misconduct in connection with his employment involves a mixed question of law and fact, to which we apply the clearly erroneous standard of review. *Hurst v. Department of Employment Security*, 393 Ill.App.3d 323, 327 (2009). "A decision is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *American Federation*, 216 Ill. 2d at 577-78. We may affirm the Board's decision on any basis supported by the record, regardless of the reason provided by the Board. *Ball v. Board of Education of the City of Chicago*, 2013 IL App (1st) 120136, ¶ 27.

¶ 50    Plaintiff first contends that the Board's finding that he authored and submitted false and/or misleading reports in connection with Hermosillo's arrest was erroneous. He argues that no competent evidence was presented to support the Board's determination. Plaintiff testified at the hearing that he did not sign the false arrest and case reports, and no one testified that he had signed the false reports. Plaintiff also testified that he did not complete the narrative portion of the reports which contained the false statements. He concludes that another person completed and signed the reports. As such, the Board's finding that plaintiff approved of the false reports, and that he was not a credible witness, was against the manifest weight of the evidence. Plaintiff cites *Kouzoukas v. Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 234 Ill.2d 446 (2009) as support.

¶ 51    In *Kouzoukas*, the plaintiff was an officer who injured her back when she attempted to move an intoxicated man from a sidewalk. *Id*. at 448. She applied for duty disability benefits and the Retirement Board held hearings on her application. *Id*. at 448-49. The evidence before the

Retirement Board included reports from her general physician, an orthopedic surgeon, a neurosurgeon, and the Retirement Board's physician. *Id*. at 449-57.

¶ 52    The physicians' reports were consistent in finding that the plaintiff was experiencing back pain. Although they mostly agreed that the plaintiff's debilitating back pain prevented her from performing her full duties as a police officer, one physician found otherwise. Dr. Spencer, a spine surgery specialist, opined that "[the plaintiff's] pain is not coming from an identifiable injury in her lumbar spine based on the pristine appearance on the MRI scan." *Id*. at 452. He recommended that the plaintiff see a gynecologist or internist to ascertain the source of her pain. *Id*. Dr. Spencer released the plaintiff for work with a temporary 20-pound lifting limit. *Id*.

¶ 53    Dr. Yapor, a neurosurgeon, agreed with Dr. Spencer that there was nothing " 'surgically wrong' " with the plaintiff's back and that her pain did not generate from her spine. *Id*. at 455-56. He testified, however, that a person can experience low back pain for reasons other than the spine, including problems with the kidneys, ovaries, uterus or intestines. *Id*. at 456. Dr. Yapor opined that the plaintiff was "permanently disabled as a police officer" because she could not perform her duties. *Id*. at 453. Dr. Konowitz treated the plaintiff for pain management. He opined that she was unable to work due to her injury because she reported pain after sitting or standing for more than five or ten minutes. *Id*. at 453.

¶ 54    The Retirement Board's physician, Dr. Demorest, found that the plaintiff had abnormal and marked tightening of "the paraspinal muscles," and she suffered from "a dysfunction of her muscles, ligaments, and tendons of her lower back." *Id*. at 456. He testified, as did Dr. Yapor, that the plaintiff showed no signs of malingering or exaggerating her pain. *Id*. at 457.

¶ 55    The Retirement Board denied the plaintiff's claim, concluding that her "complaints of pain are subjective and do not prevent her full duty return to the [Chicago police department.]" *Id*. at

461. In coming to its determination, the Retirement Board relied on the opinion of Dr. Spencer that the plaintiff was not incapacitated by her pain. Also, it found that the plaintiff and Dr. Yapor were not credible witnesses regarding the pain she was experiencing. *Id*. at 461.

¶ 56    In reviewing the decision, our supreme court made clear that although courts give considerable weight to the Retirement Board's credibility determinations, this deference is not without limits. *Id*. at 465. Courts may set aside any findings of an administrative agency that are against the manifest weight of the evidence. *Id*.

¶ 57    Our supreme court noted that "[f]rom the outset, every medical professional who examined [the plaintiff] found that she suffered pain as a result of a lower back strain that occurred on July 25, 2004, and that the pain, in turn, prevented her from returning to work as a full duty police officer." *Id*. at 467. Even Dr. Spencer agreed the plaintiff was experiencing pain. *Id*. Furthermore, Dr. Spencer's opinion that her pain was not incapacitating "stands alone" among those of her treating physicians. *Id*. The court concluded that the Retirement Board's finding that the plaintiff's pain was "subjective" was against the manifest weight of the evidence. *Id*. at 456.

¶ 58    Our supreme court also rejected the Retirement Board's finding that neither Dr. Yapor nor the plaintiff were credible witnesses. *Id*. at 468. It did not find Dr. Yapor's testimony to be evasive or inconsistent, and Dr. Demorest agreed with Dr. Yapor that the plaintiff was experiencing actual pain. *Id*. Unlike the Retirement Board, the court found the plaintiff's testimony credible where "[t]he overwhelming majority of the documentary evidence and expert testimony *** supported her claim that she suffered from debilitating pain." *Id*. Our supreme court affirmed the appellate court's decision to reverse the Retirement Board's denial of duty disability benefits. *Id*. at 469.

¶ 59    In *Kouzoukas*, our supreme court found that the Retirement Board's determination was against the manifest weight of the evidence because, although the Retirement Board ruled that the

plaintiff's pain was merely "subjective" and not established by "objective proof," every physician in the record concluded otherwise. *Id*. at 465-66. Accordingly, the court disregarded the Retirement Board's finding that the plaintiff was not a credible witness where the overwhelming evidence supported her testimony that she suffered from debilitating pain. *Id*. at 468.

¶ 60    In this case, the Board's finding that plaintiff willfully authored and/or submitted false reports was not contradicted by overwhelming evidence. Instead, the evidence supported the Board's determination.

¶ 61    The evidence showed that on July 27, 2004, plaintiff was assigned to work with Finnigan after being part of the SOS for a month. Plaintiff encountered Hermosillo inside his building and chased him into his apartment where plaintiff detained Hermosillo. Finnigan then appeared holding a shoebox that contained plastic bags, which plaintiff later inventoried. The box also contained a piece of mail addressed to Castro, which was not listed on the inventory report signed by plaintiff. Plaintiff filled out portions of the case and arrest reports, which he was required to submit as an arresting officer. He testified, however, that he did not complete the narrative portion, nor did he sign or review the reports before they were submitted. He agreed that if he had read the reports, he would have known that the narrative contained false statements.

¶ 62    Plaintiff believed that Finnigan completed the narratives because it was "Officer Finnigan's case. This was his information and follow-through. This wasn't mine to omit." Plaintiff had minimal contact with Finnigan as this was the first time he worked with him. He testified that since he was not a part of Finnigan's regular team, he "allowed them to head their investigation the way they see fit." Plaintiff trusted Finnigan to tell the truth about the incident because he had no reason to believe "there was anything untoward or illegal about what my partner was doing at the time."

¶ 63    The Board recognized that its decision depended on whether the false statements were "willful" on the part of plaintiff. The Board noted that plaintiff knew he should have reviewed the reports to ensure their accuracy, and he testified that he would not allow someone to sign and submit a report on his behalf without first reviewing it. However, that is what occurred in this case. The Board reasoned that "[e]ven if [plaintiff] had no reason to believe 'anything was misleading or false,' it does not follow that [plaintiff]—contrary to his common practice—would have so easily trusted Officer Finnigan that he would not have reviewed the report on that particular night." The Board concluded that plaintiff "knew about Officer Finnigan's actions, ceded to Officer Finnigan's pressure by burying his head in the sand, and intentionally did not fill out the rest of the report, instead leaving it to another officer to complete the report in a manner that was consistent with the cover-up narrative developed to protect the police officers."

¶ 64    We note that proof of willful and wanton misconduct generally does not require proof of *intentional* wrongdoing. See *Taylor v. City of Chicago*, 2024 IL App (1st) 221232, ¶ 76 (finding that willful and wanton misconduct "occupies that area between simple negligence and intentional wrongdoing"). Regardless, a person's intent is a fact question that is " 'seldom subject to direct proof and must generally be inferred from circumstances which warrant the inference.' " *Masood v. Division of Professional Regulation of the Department of Financial and Professional Regulation*, 2023 IL App (1st) 220657, ¶ 54, quoting *People v. Kline*, 41 Ill.App.3d 261, 266 (1976).

¶ 65    Here, circumstantial evidence supports the Board's finding that plaintiff willfully authored and submitted false case and arrest reports. Plaintiff knew he was an arresting officer in Hermosillo's case, and he admitted he completed portions of the arrest report. However, he intentionally left the narrative portions blank because it was "Officer Finnigan's case. This was

his information and follow-through." Furthermore, plaintiff did not ask to review the completed reports before their submission, thereby allowing Finnigan to file false case and arrest reports with plaintiff's name attached. He understood that he was required to sign off on such reports. Plaintiff also admitted that the inventory report he prepared and submitted contained false information.

¶ 66    Plaintiff, relying on the dissent of Board member Block, disagrees. Block found that it was "just as likely" that Finnigan hid his wrongdoing from plaintiff and that plaintiff had no knowledge of Finnigan's misconduct in filing the reports. Block took issue with the Board's characterization of the evidence, finding that leaving the narrative portions blank likely indicated sloppiness on plaintiff's part rather than intentional misconduct. As for the inventory report, Block found no reason to conclude that plaintiff "acted willfully when identifying himself as the 'found by' officer." In Block's view, plaintiff "should have taken better care preparing the report."

¶ 67    Although Board members came to different conclusions based on the evidence, it is not our function to reweigh the evidence or make an independent determination of the facts. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill.2d 76, 88 (1992). Instead, our function is to ascertain whether the findings and decision of the Board are against the manifest weight of the evidence. *Id*. To find that the Board's decision was against the manifest weight of the evidence, we "must conclude that all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident." *Haynes v. Police Board of the City of Chicago*, 293 Ill.App.3d 508, 511 (1997). If the record contains any competent evidence to support the Board's decision, it should be affirmed. *Id*. We find that the evidence supports the Board's decision, and the opposite conclusion is not clearly evident.

¶ 68    Plaintiff also contends that the Board's finding that he failed to report any incidents regarding the arrests of Castro and Hermosillo to the Department was against the manifest weight of the evidence. Rather, his testimony showed that he was unaware "anything was searched" or that Castro was under arrest when he spoke with Finnigan. He also had no reason to believe that Finnigan submitted false reports. He argues that the Board's finding thus relied upon "impermissible inferences and speculation."

¶ 69    We disagree. The Board found plaintiff's testimony that there "was nothing to report," and that he "wasn't aware of illegal activity," disingenuous. It reasoned that plaintiff knew there was no warrant to search Castro's residence and that officers had entered the residence. Although plaintiff may not have searched Castro's home himself, "it is another thing to find that [plaintiff] knew nothing of the other officer's actions." Plaintiff also knew that they drove around the city with Castro before he was processed, and that plaintiff did not have a warrant when he entered Hermosillo's apartment. The Board concluded that "[a]ny one of those events [was] questionable and should have given [plaintiff] pause." The Board's finding was not against the manifest weight of the evidence.

¶ 70                      B. *Board's Decision to Terminate*

¶ 71    Since we have determined that the Board's findings were not against the manifest weight of the evidence, we next consider whether those findings provide a sufficient basis for plaintiff's discharge. *Franko v. Police Board of the City of Chicago*, 2021 IL App (1st) 201362, ¶¶ 42-43. We will not reverse the Board's decision to discharge plaintiff for cause unless it was arbitrary, unreasonable, or unrelated to the requirements of service. *Id*. ¶ 43.

¶ 72    In making its determination, the Board heard testimony from plaintiff's mitigation witnesses and noted his complimentary and disciplinary histories. The Board concluded, however,

that plaintiff's "accomplishments as a police officer and the mitigation witnesses' positive evaluations do not outweigh the seriousness of [his] misconduct." The Board found that plaintiff's "dishonesty directly relates to his duties as a police officer and ultimately renders him unfit to hold that office."

¶ 73    First, plaintiff "inaccurately listed himself as the recovering officer on an inventory report—an inaccuracy so serious that it would have implications for chain of custody and jeopardize a prosecution." Inventory reports are often used to refresh the recollection of a police officer, as well as establish the chain of custody for admitting evidence at trial.

¶ 74    Additionally, it is well-established that " 'as the guardians of our laws, police officers are expected to act with integrity, honesty, and trustworthiness.' " *Rodriguez v. Weis*, 408 Ill.App.3d 663, 671 (2011), quoting *Sindermann v. Civil Service Commission*, 275 Ill.App.3d 917, 928 (1995). A determination that an officer has lied not only affects the public's perception of the Department, but it also undermines the officer's credibility as a witness in the prosecution of crimes. Either of these outcomes would be a serious liability to the Department. *Rodriguez*, 408 Ill.App.3d at 671. We do not find the Board's decision to discharge plaintiff from his position as a police officer arbitrary, unreasonable, or unrelated to the requirements of service.

¶ 75    Plaintiff disagrees, arguing that the Board's decision to terminate his employment was unreasonable compared to the discipline imposed upon Officer McKeon. He contends that the Department investigated Officer McKeon regarding the same arrest incidents and also charged him with misconduct, including the failure to report other officer's misconduct. The allegations against McKeon, however, were not sustained.

¶ 76    We note that "cause for discharge can be found regardless of whether other employees have been disciplined differently." *Launius v. Board of Fire and Police Commissioners of the City*

*of DesPlaines*, 151 Ill. 2d 419, 442 (1992). This is particularly so where differing facts in the other case prevent meaningful comparison to the case at issue. *Id*. Here, plaintiff not only was charged with failing to report misconduct, but he was also charged with authoring and submitting false reports. That finding was sustained and the Board relied on that finding as an additional basis for its decision to terminate him. We affirm the circuit court's judgment upholding the Board's decision to discharge plaintiff.

¶ 77                                    C. *Due Process*

¶ 78    Plaintiff next contends that the Board's decision should be reversed where the administrative proceeding violated his constitutional right to due process. An administrative proceeding must follow the fundamental principles of due process. *Abrahamson*, 153 Ill.2d at 92. "However, due process is a flexible concept and requires only such procedural protections as fundamental principles of justice and the particular situation demand." *Id*. To satisfy the requirements of due process, an administrative hearing need not proceed in the nature of a judicial hearing. *Id*. Rather, "[a] fair hearing before an administrative agency includes the opportunity to be heard, the right to cross-examine adverse witnesses, and impartiality in ruling upon the evidence." *Id*. at 95. Whether an administrative hearing conformed to the requirements of due process is a question of law that we review *de novo*. *Engle v. Department of Financial and Professional Regulation*, 2018 IL App (1st) 162602, ¶ 43.

¶ 79    Here, plaintiff presented evidence and testified at his hearing, he had the opportunity to cross-examine all witnesses who testified, and he does not challenge the Board's impartiality on appeal. He contends, however, that his right to due process was nevertheless violated where he had no opportunity to confront witnesses against him, specifically Castro, Hermosillo and Sergeant Torres. None of these individuals testified at his hearing. As support, plaintiff cites *Kimble v.*

*Illinois State Board of Education*, 2014 Il App (1st) 123436, and *Colquitt v. Rich Township High School District No. 227*, 298 Ill.App.3d 856 (1998).

¶ 80    In *Kimble*, a tenured teacher was dismissed based on allegations that she pushed and choked a 10-year-old student, which she disputed. *Kimble*, 2014 Il App (1st) 123436, ¶¶ 1-2. No witnesses observed the incident, and the student, J.W., did not appear or testify at the hearing. Instead, a counselor at the school was allowed to testify about J.W.'s statements to her on the incident. *Id*. ¶ 26. Because the teacher denied choking or pushing J.W., the court found that "the outcome of the hearing was directly dependent on the credibility" of J.W. *Id*. ¶ 82. The court held that it had "no way of knowing what actually occurred *** [and] it is simply unjust to terminate a tenured teacher's employment without giving her the opportunity to cross-examine her accuser***." *Id*. ¶ 84.

¶ 81    In *Colquitt*, a high school student named Lemont was accused of gross misconduct, harassment and verbal intimidation in connection with an incident involving three other students. *Colquitt*, 298 Ill.App.3d at 857-58. An expulsion hearing was held but none of the other students appeared or testified. Over objections of hearsay, statements the other students made to the principal were admitted at the hearing. *Id*. at 858. Two teachers who observed portions of the incident also testified. *Id*. at 858-59. However, they were not present when the altercation began. *Id*. at 864. Lemont testified that the other students were the aggressors and that he never displayed a weapon or made threats about a weapon during the altercation. *Id*. at 860. The court noted that the only witnesses who observed the entire incident were the three accusers who did not appear or testify at the hearing. *Id*. at 864. As in *Kimble*, the court found that the outcome of the hearing was directly dependent on the credibility of those witnesses and Lemont should have had the

opportunity to cross-examine them. *Id*. It held that such "expansive use of accusatory hearsay \*\*\* [was] inconsistent with and violative of due process." *Id*. at 866.

¶ 82    In both *Kimble* and *Colquitt*, there was a dispute over whether the incidents resulting in discipline actually occurred, and the outcome was entirely dependent on the credibility of the non-testifying accusers. Here, no one disputes that the reports submitted in plaintiff's name contained false statements. The only issue was whether the submission was willful on plaintiff's part, and the only witness whose credibility the Board needed to resolve was plaintiff's. The testimony of Castro, Hermosillo and Sergeant Torres would not shed light on this issue. The Board also did not rely on other witnesses' hearsay statements in making its determination. Therefore, the due process concerns expressed by the court in *Kimble* and *Colquitt* are not present in this case. We find that plaintiff was not denied due process when he did not have the opportunity to cross-examine Castro, Hermosillo and Sergeant Torres.

¶ 83    Plaintiff also contends that due process was violated where the investigation spanned almost 17 years from the date of the incident to the filing of charges against him. He argues that such a delay was unreasonable. He further contends that the delay violated Police Department General Order 93-03, [1] which requires a prompt and thorough investigation.

¶ 84    It is well-established that plaintiff has a property right in his employment. See *Morgan v. Department of Financial and Professional Regulation*, 374 Ill.App.3d 275, 300 (2007). Accordingly, courts have found a due process violation when there is a substantial delay in adjudicating allegations of misconduct after an employee has been *suspended*. (Emphasis added.)

---

[1] Although General Order 93-03 governed investigations in 2004, investigations are now governed by General Order 08-01. The parties agree that for purposes of this appeal, the content of the orders is substantially the same.

See *Lyon v. Department of Children and Family Services*, 209 Ill.2d 264, 282 (2004), and *Morgan*, 374 Ill.App.3d at 303.

¶ 85    Here, plaintiff never lost his property interest in his employment while the investigation took place. He remained a paid employee of the Department during the 17-year period. After he was formally charged, plaintiff received a prompt and thorough opportunity to be heard during his hearing before the Board. As such, there was no violation of his due process rights. See *Orsa v. Police Board of the City of Chicago*, 2016 IL App (1st) 121709, ¶ 39 (finding no due process violation where the plaintiffs remained employed by the Department throughout the investigation, were immediately notified of the charges, and were given a thorough and meaningful opportunity to be heard at the hearing).

¶ 86    Regarding plaintiff's claim that the investigation violated General Order 93-03, plaintiff has not identified specific language in the order to support his argument. In any event, we find no express violation of the order's general requirement of a prompt and thorough investigation, where this directive does not set an absolute deadline for completing investigations. See *id*. ¶ 42.

¶ 87    Plaintiff's brief also lists other conduct by the Department which he contends violated the General Orders (Torres' failure to interview other witnesses, the investigation's failure to consider a non-target letter, Torres' bias against plaintiff, and the failure to inquire into a deputy superintendent's letter). However, he provides little analysis and merely concludes that the listed conduct violated the orders. This court is not a depository in which the appellant may dump the burden of argument and research. *Kic v. Bianucci*, 2011 IL App (1st) 100622, ¶ 23. Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires an appellant to include cohesive argument and citation to relevant authority to support each claim of error. Failure to do so results in forfeiture of the issue on appeal. *Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶¶ 2-3. Regardless of forfeiture,

even if the Department violated its general orders, there is no provision requiring dismissal of the charge as a sanction. *Orsa*, 2016 IL App (1st) 121709, ¶ 42.

¶ 88                                                        D. *Violation of the CBA*

¶ 89    Plaintiff next argues that the investigation violated section 6.1(D) of the CBA and the CBA's affidavit requirement. "Collective bargaining agreements are contracts and, as such, generally are interpreted according to principles of contract law." *Board of Education of Du Page High School District No. 88 v. Illinois Educational Labor Relations Board*, 246 Ill. App. 3d 967, 975 (1993). Therefore, when construing provisions of a collective bargaining agreement, our primary goal is to ascertain and give effect to the parties' intent as indicated by the plain language of the contract. *City of Rockford v. Unit Six of the Policemen's Benevolent and Protective Association of Illinois*, 351 Ill.App.3d 252, 257 (2004). Contract interpretation presents a question of law that we review *de novo*. *Owen v. Village of Maywood*, 2023 IL App (1st) 220350, ¶ 21.

¶ 90    Section 6.1(D) states, in relevant part, that:

> "Unless the Superintendent of Police specifically authorizes in writing, no complaint or allegation of any misconduct concerning any incident or event which occurred five (5) years prior to the date the complaint or allegation became known to the Department shall be made the subject of a Complaint Register investigation or be re-opened or re-investigated after (5) years from the date the Complaint Register number was issued."

Plaintiff contends that the Department violated section 6.1(D) "when it failed to get written authorization until 2013 *** regarding a 2004 occurrence," and plaintiff was served with the allegations in 2018, more than five and a half years after the Superintendent's initial authorization.

¶ 91    We disagree. After the arrests of Castro and Hermosillo in 2004, the Department received an anonymous complaint alleging an illegal arrest made by plaintiff and other officers. A

preliminary investigation ensued, and a Complaint Register number (No. 310780) was obtained for the investigation on December 19, 2005. Since the allegation was made the subject of a Complaint Register investigation less than five years after the Department received the anonymous complaint, the first part of section 6.1(D) is satisfied and does not require authorization.

¶ 92 The Department's re-investigation of plaintiff began when the Superintendent signed a written authorization on February 13, 2014. As a result, the re-investigation complied with section 6.1(D). Although plaintiff argues that he was charged more than five years after the Superintendent's initial authorization, nothing in the plain language of section 6.1(D) states that the Superintendent's authorization is only valid for five years once a case is re-opened or re-investigated. In construing a contract, courts will not alter existing terms or add new terms or conditions not contemplated by the parties. *Thompson v. Gordon*, 241 Ill.2d 428, 449 (2011).

¶ 93 As for the CBA's affidavit requirement, plaintiff argues that except in limited circumstances, no investigation may take place without an affidavit from the citizen complainant. He contends that only an affidavit from Sergeant Torres was obtained in this case. However, as the Superintendent argues in his brief, an exception exists when a citizen files an anonymous complaint of criminal conduct. The CBA states that "[n]o affidavit will be required in support of anonymous complaints of criminal conduct." The investigation of plaintiff began when the Department received an anonymous complaint alleging misconduct by police officers. Plaintiff was then charged with criminal offenses, including home invasion and aggravated kidnapping. We find no violation of the plain terms of the CBA.

¶ 94                                    E. *Laches*

¶ 95 Plaintiff next contends that the doctrine of *laches* applied to bar the charges against him. "Laches is an equitable doctrine which precludes the assertion of a claim by a litigant whose

unreasonable delay in raising that claim has prejudiced the opposing party." *Tully v. State*, 143 Ill. 2d 425, 432 (1991). To prevail, plaintiff must establish 1) a lack of due diligence by the Department in bringing the action, and 2) the resulting delay caused prejudice to him. See *Lozman v. Putnam*, 379 Ill. App. 3d 807, 822 (2008). Whether *laches* applies to preclude a claim is a question of law which we review *de novo*. *Noland v. Mendoza*, 2022 IL 127239, ¶ 30.

¶ 96    Plaintiff mentions the passage of time but does not expound upon the Department's lack of due diligence. In fact, the investigation into plaintiff in connection with Operation Broken Oath involved multiple officers who engaged in numerous incidents of criminal conduct over a long period of time. Although criminal charges against plaintiff were dismissed in 2009, criminal prosecutions in connection with Operation Broken Oath did not conclude until 2013. After the criminal prosecutions were resolved, the Department received documents from the FBI. In 2014, the Department received authorization to investigate officers such as plaintiff, who were not criminally prosecuted, for administrative misconduct. Plaintiff was served with the BIA's formal allegations in 2018, and in 2020, the superintendent filed seven charges against him. Given this timeline, and the complexity of the investigations, we do not find that the Department "knowingly slept on [its] rights to the detriment of the opposing party." *Orsa*, 2016 Il App (1st) 121709, ¶ 44.

¶ 97    Furthermore, plaintiff has not established prejudice. Plaintiff argues that he was prejudiced by the unreasonable delay because evidence was lost or obscured, thus preventing the Board from ascertaining the truth. As support, he cites *Mank v. Board of Fire and Police Commissioners*, 7 Ill.App.3d 478 (1972). The court in *Mank* found that *laches* applied to bar the charges of undue force against an officer where they were filed more than three years after the incident, the record indicated that there was conflicting testimony as to what occurred, and key witnesses were no

longer available to testify. *Id*. at 485-86. As a result, it found that the delay was "sufficient to cause prejudice where the factual dispute is solely dependent on recollection." *Id*. at 486.

¶ 98    However, *Mank* is distinguishable where there was conflicting evidence regarding the officer's alleged misconduct, and key witnesses were unavailable to testify due to the passage of time. It is undisputed that misconduct, in the form of false reports, occurred here. Although plaintiff argues that he had limited recollection of the 2004 arrest incidents at the hearing, the relevant issue was whether plaintiff willfully submitted the false reports. On that issue, plaintiff testified clearly about his intent in filling out the reports.

¶ 99    Moreover, courts are reluctant to apply the doctrine of laches "to public bodies under usual circumstances." *Hickey v. Illinois Central Railroad Co*., 35 Ill. 2d 427, 447 (1966). Our supreme court reasoned that application of *laches* to governmental bodies may impair the discharge of their government functions, and "valuable public interests may be jeopardized or lost by the negligence, mistakes, or inattention of public officials." *Id*. at 447-48. Rather, the doctrine applies in extraordinary circumstances where government officials engaged in positive acts that induced the defendant to act. *Id.* at 448-49. Mere nonaction by government officials is insufficient to support *laches* against the state. *Id.* See also *Van Milligan v. Board of Fire and Police Commissioners*, 158 Ill. 2d 85, 91 (1994) (finding that *laches* applies to the exercise of governmental power only under "compelling circumstances"). Plaintiff has not alleged any compelling circumstances or positive acts by the Department. For the reasons set forth, we find the doctrine of *laches* inapplicable here.

¶ 100                                   F. *Res Judicata*

¶ 101   Plaintiff also contends that *res judicata* applies to bar the Department from charging him with allegations that were decided or could have been decided in 2004 and 2005. He argues that the Department had already investigated the July 27, 2004 incidents and found the allegations

against him "not sustained." Whether a claim is barred as *res judicata* is a question of law we review *de novo*. *Matejczyk v. City of Chicago*, 397 Ill. App. 3d 1, 7 (2009).

¶ 102    The doctrine of *res judicata* applies if the following requirements are satisfied: (1) there was a final judgment on the merits rendered by a court of competent jurisdiction, (2) there is an identity of cause of action, and (3) there is an identity of parties or their privies. *Taylor v. Police Board of the City of Chicago*, 2011 IL App (1st) 101156, ¶ 20. Administrative decisions have *res judicata* effect where the administrative determination is made in proceedings that are adjudicatory, judicial, or quasijudicial in nature. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 71. In this case, there was an adversarial hearing in which plaintiff testified, and his counsel presented evidence, cross-examined witnesses, and made a closing argument. Therefore, the Board's administrative hearing was judicial in nature and *res judicata* may be applicable. *Id*.

¶ 103    Plaintiff relies on *In the Matter of Luis Lopez*, 16 PB 2923 (May 17, 2018), arguing that his case is identical to *Lopez*. In *Lopez*, the Board found that *res judicata* applied to bar certain allegations.

¶ 104    However, we find *Lopez* distinguishable. In 2005, after an investigation was completed, the sergeant sustained allegations that Officer Lopez violated a rule by leaving duty without proper authorization but found allegations that he failed to comply with General Order 03-03-01 were not sustained. The sergeant recommended reprimand as discipline for the violation and Lopez accepted the findings and the recommended reprimand. *Id*. at 9.

¶ 105    In 2016, after a civil lawsuit was filed in the matter, the Department reopened its investigation into Lopez's conduct. *Id*. at 10. The Board, however, found that the Department's 2005 dispositions were "final," and the parties involved in the investigations were identical. *Id*. at 24. Therefore, all 2016 allegations involving violations of the same order based on conduct

investigated in 2005, as well as charges that could have been brought under that order, were barred as *res judicata*. *Id*. at 25.

¶ 106   In *Lopez*, the Board found that the Department's 2005 dispositions were final adjudications on the merits. An adjudication is "on the merits" if it resolves the parties' rights and liabilities based on the facts before the court. *Lelis v. Board of Trustees of the Cicero Police Pension Fund*, 2013 Il App (1st) 121985, ¶ 31.

¶ 107   No such adjudication occurred here. The Department closed the investigations arising out of Castro's and Hermosillo's lawsuits because Castro and Hermosillo refused to provide affidavits to support them. Although the allegations were "not sustained," the Department made no findings of fact or final determinations based on findings of fact. The Department simply could not proceed with its investigation without the affidavits. See *Lopez*, 2017 IL 120643, ¶ 72 (finding that there was a final judgment on the merits where an adversarial hearing was conducted in which evidence was presented and witnesses testified, and the Board issued a decision after the hearing). See also *Wenig v. Lockheed Environmental Systems and Technologies Co.*, 312 Ill. App. 3d 236, 242 (2000) (finding that where the administrative law judge conducted no hearing on the merits of the case and resolved no issues of disputed fact, the circuit court erred in dismissing the plaintiff's claim of retaliatory discharge as barred by *res judicata*).

¶ 108   Since there was no final adjudication on the merits in connection with the Department's initial investigations, we find that the doctrine of *res judicata* did not bar the allegations considered by the Board in the underlying proceedings.

¶ 109                                    III. CONCLUSION

¶ 110   For the foregoing reasons, we find that the Board's decision to discharge plaintiff was supported by the evidence and was not arbitrary, unreasonable, or unrelated to the requirements of service. The judgment of the circuit court is affirmed.

¶ 111   Affirmed.